59 A.3d 545

Benn RAY, et al.

v.

MAYOR AND CITY COUNCIL OF BALTIMORE, et al.

No. 21, Sept. Term, 2012.

Court of Appeals of Maryland.

Jan. 22, 2013.

G. Macy Nelson (David S. Lynch of Law office of G. Macy Nelson, LLC, Towson, MD), on brief, for petitioners.

Charles S. Hirsch (Jon M. Laria of Ballard Spahr LLP, Baltimore, MD; Jason T. Vettori of Smith, Gildea & Schmidt, LLC, Towson, MD), on briefs, for respondents.

Sandra R. Gutman, Chief Solicitor (George A. Nilson, City Solicitor, Adam S. Levine, Assistant Solicitor, Baltimore City Department of Law, Baltimore, MD), on brief, for respondents.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA, and McDONALD, JJ.

ADKINS, J.

Petitioners here seek to block a Planned Unit Development ("PUD") with a Wal–Mart supercenter in Baltimore City, but have been stymied by Circuit Court and appellate rulings against them on the threshold question of standing. Although the test to show standing has been established in Maryland for more than half a century, the issue continues to generate appellate cases. That is partly because the test is fact-sensitive and is not readily reduced to a set of rules.

■ As we have explained, to have standing to challenge a zoning reclassification, a person's property interest "must be such that he is personally and specially affected in a way different from that suffered by the public generally." *See Bryniarski v. Montgomery Cnty. Bd. of Appeals*, 247 Md. 137, 144, 230 A.2d 289, 294 (1967). Today, we decline to adopt Petitioners' theory that the class of persons aggrieved by

approval of this PUD must include the entire Charles Village and Remington neighborhoods. Moreover, Petitioner's alternative argument, that they meet the specially aggrieved standard set forth above, does not withstand close examination.

## FACTS AND LEGAL PROCEEDINGS

On November 22, 2010, the Baltimore City Council passed Ordinance 10–397, which approved a PUD for an 11.5–acre tract of land known as the "25th Street Station." The PUD authorizes a mixed-use development located in the Remington and Charles Village neighborhoods of Baltimore City. It is anticipated to "bring approximately 20 national retailers ..., as well as 70–80 market-rate apartment units."

Benn Ray and Brendan Coyne ("Petitioners") filed a Petition for Judicial Review of the PUD's approval. Ray resides in the Remington neighborhood at 279 W. 31st Street, Baltimore, Maryland. His residence is 2,212.39 feet, or approximately 0.4 miles, away from the PUD. Ray claims that he can see the PUD site from his second-floor bathroom during the winter months of the year, and that he can hear noise from the PUD site when his second-floor bathroom window is open. He believes that the PUD "will directly and dramatically increase traffic ... in front of [his] home," which "will make it more dangerous for [him,]" given that "W. 31 St. is a narrow residential road that [he] believe[s] is ill equipped to handle the increased level of traffic." Ray also believes that "the Wal–Mart planned to be part of the project will change the character of [his] neighborhood."

Coyne resides in the Charles Village neighborhood at 2738 Guilford Ave., Baltimore, Maryland 21218. His residence is 2,002.18 feet, or approximately 0.4 miles, away from the PUD. Coyne has produced no evidence to show that he can see or hear the PUD from his residence.[1] Coyne's main contention is that the PUD, and specifically the planned Wal–Mart store,

---

1. Coyne does claim he can see the PUD from a conference room on the sixth floor of his office building, although he admits that he works on the first floor of that building.

will adversely change the character of his neighborhood because the Wal–Mart store will force out many local businesses that he frequents, resulting in vacant buildings in his neighborhood. Coyne is of the opinion that the addition of the Wal–Mart store will also lower wages of workers in his neighborhood, causing there to be "fewer employed people." He believes that this "will lead to a higher number of residents failing to properly maintain their property." Coyne claims that he is familiar with property values in the neighborhood and believes that these adverse effects will make "Charles Village a less desirable place to live," thereby decreasing the value of his home.

The Mayor and City Council of Baltimore City, the owners of the subject property, and the developers of the PUD ("Respondents") timely responded to the petition for judicial review, and all filed motions to dismiss, alleging that Petitioners lacked standing to challenge the PUD. In a written order, Judge Pamela J. White of the Baltimore City Circuit Court granted Respondents' motions and dismissed Petitioners' Petition for Judicial Review. She found that "Petitioners are not 'adjoining, confronting or nearby' property owners and thereby do not enjoy prima facie aggrieved status." Nor had Petitioners shown any special interest or damage unique to Petitioners that would distinguish them from the general public. Judge White explained that "see[ing] roof tops or parking lots or traffic activity ... or hear[ing] city noise from blocks away, or deal[ing] with traffic congestion, or worry[ing] about local businesses ... are not circumstances that are unique or different from many other Baltimore residents among the general public." Judge White also found that Coyne's beliefs about the potential decrease in his property's value were not admissible.

The Court of Special Appeals affirmed. In a reported opinion authored by Judge Moylan, the intermediate appellate court agreed with the Circuit Court that Petitioners did not qualify for *prima facie* aggrieved status and that Petitioners had failed to show any special aggrievement different from the

public generally. *Ray v. Mayor of Balt.*, 203 Md.App. 15, 35–36, 45–46, 36 A.3d 521, 533, 539–40 (2012).

On May 9, 2012, this Court granted a writ of certiorari, *Ray v. Mayor of Baltimore*, 426 Md. 427, 44 A.3d 421 (2012), to answer the following questions:

1. Did the Court of Special Appeals err when it equated Petitioners' neighborhoods of Charles Village and Remington with the general public and ruled that they lacked standing because others in their neighborhood were adversely affected in similar ways?

2. Did the Court of Special Appeals err when it held that Petitioners lacked standing because they were neither "nearby" nor specially aggrieved without considering the unique adverse effects caused by a new type of large development on 11.5 acres in an urban neighborhood? [2]

We shall hold that the Circuit Court did not err in dismissing Petitioners' Petition for Judicial Review.

## DISCUSSION

Petitioners filed for judicial review of the PUD ordinance under Md.Code (1957, 2010 Repl.Vol.), Article 66B, § 2.09(a)(1)(ii). This section provides:

(a) *Who may appeal; procedure.*—(1) An appeal to the Circuit Court of Baltimore City may be filed jointly or severally by any **person,** taxpayer, or officer, department, board, or bureau of the City **aggrieved** by:

(i) A decision of the Board of Municipal and Zoning Appeals; or

(ii) A zoning action by the City Council.

(Emphasis added).[3]

---

**2.** In their brief, Petitioners raise the issue of whether the Circuit Court was correct in ruling that Coyne's testimony on the decrease in his property value was inadmissible. The second question presented encompasses this issue, and we address it below.

**3.** Effective October 1, 2012, this statute was repealed from Md.Code (1957, 2010 Repl.Vol.), Article 66B, § 2.09, and recodified at Md.Code

*Id.* In *Bryniarski v. Montgomery County Board of Appeals,* this Court described a "person aggrieved" as:

> one whose personal or property rights are adversely affected by the decision of the board. The decision must not only affect a matter in which the protestant has a specific interest or property right but his interest therein must be such that he is **personally and specially affected in a way different from that suffered by the public generally.** (Emphasis added).

247 Md. at 144, 230 A.2d at 294.[4] The Court then offered several general principles, two of which are relevant here. First, "[a]n adjoining, confronting or nearby property owner is deemed, *prima facie,* to be specially damaged and, therefore, a person aggrieved." *Id.* at 145, 230 A.2d at 294. Second, "[a] person whose property is far removed from the subject property ordinarily will not be considered a person aggrieved . . . [unless] he meets the burden of alleging and proving . . . that his personal or property rights are specially and adversely affected." *Id.,* 230 A.2d at 295.

■ Beyond these general principles provided in *Bryniarski,* we have not articulated what it means to be "specially affected" or how one proves that his harm is different from the public harm. Rather, the standard is flexible in the sense that it is based on a fact-intensive, case-by-case analysis.

---

(2012), § 10–501 of the Land Use Article. *See* Chapter 426 of the Acts of 2012.

**4.** The statute granting the right to judicial review in effect in *Bryniarski* provided:

> (j) *Appeal from board to court.*—Any **person** or persons jointly or severally **aggrieved** by any decision of the board of zoning appeals, or any taxpayer, or any officer, department, board or bureau of the municipality, may appeal to a court of record on the ground that such decision is illegal in whole or in part. (Emphasis added).

Md.Code (1957, 1965 Cum.Supp.), Article 66B, § 7(j). Although the language has been subsequently amended on several occasions, this statute was the predecessor to the current law, which was amended in 1970 to become Md.Code (1957, 1970 Repl.Vol.), Article 66B, § 2.09(a). *See* Chapter 672 of the Acts of 1970. Importantly, for our purposes, the language of a "person aggrieved" has remained constant through the evolution of the statute.

Therefore, before we can determine whether Petitioners are "specially affected," we examine the fact patterns that have emerged from our earlier cases.

In doing so, we keep in mind that the concept of special aggrievement used in current zoning laws has its roots in the laws pertaining to the tort action of public nuisance. *See* 4 Edward H. Ziegler, Jr., *Rathkopf's The Law of Zoning and Planning* § 63:14 (2012) ("This strict standard of [special] aggrievement for standing to enforce a zoning ordinance is based in early nuisance law which antedated zoning."). As the *Rathkopf's* treatise explains,

> [T]he "special damage" rule was an outgrowth of the law of public nuisance. **Inasmuch as a public nuisance was an offense against the state and, accordingly, was subject to abatement on motion of the proper govern-mental agency, an individual could not maintain an action for a public nuisance unless he suffered some special damage from the public nuisance.** (Emphasis added).

*Id.* (quoting *Skaggs–Albertson's v. ABC Liquors, Inc.,* 363 So.2d 1082, 1088 (Fla.1978)) (alteration in original). Without the special damage, "a private citizen has no standing to champion the right of the public in abating a public nui-sance." [5] *Id.* § 63:14 n. 1.

When we examine Petitioners' specific arguments, we will call upon the law of nuisance for enlightenment. But first, we will review how the Maryland cases have applied the princi-ples summarized in *Bryniarski.*

### Proximity as a Measuring Stick of Standing

▮▮▮▮ A review of our cases, where standing to challenge a rezoning action was at issue, reveals one critical point: prox-

---

**5.** A private nuisance is "a nontrespassory invasion of another's interest in the private use and enjoyment of land." *Rosenblatt v. Exxon Co., U.S.A.,* 335 Md. 58, 80, 642 A.2d 180, 190 (1994) (internal citation and quotation marks omitted). A public nuisance is a "nuisance[] which ha[s] a common effect and produce[s] a common damage." *Burley v. Annapolis,* 182 Md. 307, 312, 34 A.2d 603, 605 (1943).

imity is the most important factor to be considered. The relevance and import of other facts tending to show aggrievement depends on how close the affected property is to the rezoned property.[6] There is, however, no bright-line rule for exactly how close a property must be in order to show special aggrievement. Instead, this Court has maintained a flexible standard, finding standing in cases that do not quite satisfy the "adjoining, confronting or nearby" standard of *prima facie* aggrievement, but are nudging up against that line. Protestants in such cases will be considered to pass the standing threshold if they allege specific facts of their injury. In other words, once sufficient proximity is shown, some typical allegations of harm acquire legal significance that would otherwise be discounted. But in the absence of proximity, much more is needed.

For example, an owner's lay opinion of decreasing property values and increasing traffic has been considered sufficient for special aggrievement when combined with proximity that is almost as great as in cases where properties are "adjoining, confronting or nearby." *See Habliston v. Salisbury*, 258 Md.

---

**6.** When deciding whether a protestant is *prima facie* aggrieved, which Petitioners do not claim, proximity is the only relevant factor. The inquiry is focused solely on whether the protestant is "[a]n adjoining, confronting or nearby property owner." *Bryniarski v. Montgomery Cnty. Bd. of Appeals*, 247 Md. 137, 145, 230 A.2d 289, 294 (1967). Although proximity is the sole determinative factor, courts have mentioned additional claims of aggrievement present in a given case, if those claims supported that court's holding. For example, increased traffic congestion, change in the nature of the neighborhood, and the protestant's ability to see and hear the rezoned property have been mentioned in *prima facie* cases. *See Wier v. Witney Land Co.*, 257 Md. 600, 604, 612–13, 263 A.2d 833, 835, 839 (1970) (protestants *prima facie* aggrieved by reclassification of 299.192 acres to permit apartments and businesses and referencing increased traffic, change in nature of land, and location within sight distance); *Bryniarski*, 247 Md. at 138, 146, 148, 230 A.2d at 291, 295–96 (protestants *prima facie* aggrieved by special exception to construct hotel on 1.7697 acres and referencing increased traffic and change in nature of land); *see also 120 W. Fayette St., LLLP v. Mayor of Balt.*, 407 Md. 253, 272–73, 964 A.2d 662, 673 (2009) (adjacent property owner had *prima facie* standing to challenge a "municipalities' [sic] allegedly illegal avoidance of urban renewal and procurement ordinances" and referencing sight and noise of illegal development).

350, 352, 354–55, 265 A.2d 885, 885–87 (1970) (protestant 200 to 500 feet away from reclassification of 16 acres to residential was specially aggrieved based on close proximity and lay testimony of decreasing property value); *Chatham Corp. v. Beltram,* 252 Md. 578, 579–80, 584, 251 A.2d 1, 2, 4 (1969) (protestants in sight of 6.74 acres reclassified to permit apartments were "specially aggrieved" based on "proximity of their homes within [1000 feet of the rezoning] and their feeling that the increased density would depreciate their property values"); *see also Alvey v. Hedin,* 243 Md. 334, 337, 339, 221 A.2d 62, 63–64 (1966) (protestants 250 feet away from rezoning to construct marina on 4.75 acres were specially aggrieved based on close proximity and special problems with lights, noise, and refuse); *Toomey v. Gomeringer,* 235 Md. 456, 460, 201 A.2d 842, 844 (1964) (about two city blocks away and testimony of real estate expert that there was change in residential character and decreasing property values).[7]

Conversely, without sufficient proximity, similar facts will only support general aggrievement. For example, when the affected properties are not sufficiently close to the site to qualify as almost *prima facie* aggrieved, claims of increasing traffic, change in the character of the neighborhood, lay opinion projecting a decrease in property values, and limited visibility have been held to show only general aggrievement. *See Shore Acres Improvement Ass'n, Inc. v. Anne Arundel Cnty. Bd. of Appeals,* 251 Md. 310, 312, 317–18, 247 A.2d 402, 403, 406 (1968) (protestant 3760 feet in straight line, or 9400 feet by road, not specially aggrieved by reclassification of 206 acres to apartments and commercial, despite claim of increased traffic); *White v. Major Realty, Inc.,* 251 Md. 63, 64, 246 A.2d 249, 250–51 (1968) (protestant 0.5 miles away, who alleged increased traffic, increase use of water system, over-

7. We treat these four cases as being outside of the zone of *"prima facie "* aggrieved because the opinions discussed special aggrievement. Arguably, though, these should be considered instances of *prima facie* aggrievement. Both *Alvey* and *Toomey* predated the articulation of the *prima facie* standard found in *Bryniarski,* and neither *Habliston* nor *Chatham* addressed whether the protestants were *prima face* aggrieved.

crowded schools, and change in character of community, not specially aggrieved by reclassification of 64 acres to residential and apartments); *Wilkinson v. Atkinson,* 242 Md. 231, 233–35, 218 A.2d 503, 505–06 (1966) (protestant 750 feet in straight line, or 0.7 miles by road, who testified that she could see the property across the Beltway, provided lay opinion of decreasing property values, and alleged change in the community and increased traffic, not specially aggrieved by reclassification to apartments); *DuBay v. Crane,* 240 Md. 180, 182–84, 185–86, 213 A.2d 487, 488–90 (1965) (three protestants 1500 feet, 0.4 miles, and 0.9 miles away, who claimed increase in sewage disposal, increased traffic, and lay opinion of decreasing property values, not specially aggrieved by reclassification of 35 acres for apartments); *Marcus v. Montgomery Cnty. Council,* 235 Md. 535, 537–38, 541, 201 A.2d 777, 778–79, 781 (1964) (protestants with claims of increased traffic, increase in school population, 0.25 miles and 0.75 miles away from site re-zoned to apartments and commercial only generally aggrieved); *Pattison v. Corby,* 226 Md. 97, 99–100, 103, 172 A.2d 490, 491–92, 494 (1961) (claim of change in character of neighborhood by protestant a "considerable distance" away from the 54 acres to be rezoned as multiple family residential was general aggrievement).

 In sum, Maryland courts have accorded standing to challenge a rezoning action to two types of protestants: those who are *prima facie* aggrieved and those who are almost *prima facie* aggrieved. A protestant is *prima facie* aggrieved when his proximity makes him an adjoining, confronting, or nearby property owner. A protestant is specially aggrieved when she is farther away than an adjoining, confronting, or nearby property owner, but is still close enough to the site of the rezoning action to be considered almost *prima facie* aggrieved, *and* offers "plus factors" supporting injury. Other individuals are generally aggrieved.

Dicta in Maryland cases suggest a third, poorly-defined category of protestants with standing who, despite being "far removed from the subject property," may nevertheless be able

to establish "the fact that his personal or property rights are specially and adversely affected by the board's action." *Bryniarski*, 247 Md. at 145, 230 A.2d at 295. Although this point has been repeated in other cases,[8] we have found no instance in which the Court held that a person who was far removed from the site of rezoning actually qualified as "specially aggrieved."

### This Case

With this framework in mind, we turn to the issues presented by this case. Petitioners advance two arguments: (1) the aggrieved class should be defined as the entire neighborhood; and (2) their claims for special aggrievement—including their proximity to the PUD, a change in the character of the neighborhood, increased traffic, and visibility of the PUD—are sufficient to establish standing. Additionally, Petitioner Coyne argues that the Circuit Court erred in ruling inadmissible his testimony regarding a decrease in the value of his property.

### *Petitioners vs. General Public*

Petitioners argue that the Court of Special Appeals improperly compared them to other residents of Charles Village and Remington, which they assert are the areas the PUD will impact.[9] Instead, they maintain that "an analysis of whether

---

8. *See, e.g., Wier,* 257 Md. at 611, 263 A.2d at 838 (quoting *Bryniarski,* 247 Md. at 145, 230 A.2d at 295); *Shore Acres Improvement Ass'n, Inc. v. Anne Arundel Cnty. Bd. of Appeals,* 251 Md. 310, 317–18, 247 A.2d 402, 406 (1968) (quoting same); *Aubinoe v. Lewis,* 250 Md. 645, 650, 244 A.2d 879, 882 (1968) (quoting same); *Chesapeake Bay Found., Inc. v. Clickner,* 192 Md.App. 172, 185–86, 993 A.2d 1163, 1171 (2010) (quoting same); *Comm. for Responsible Dev. on 25th St. v. Mayor of Balt.,* 137 Md.App. 60, 86, 767 A.2d 906, 920 (2001) (quoting same).

9. Petitioners rely on the provision in Ordinance 10–397, which approved the PUD in this case. The Ordinance established a "PUD Design Review Committee," to be composed of representatives from several surrounding neighborhoods, including the Greater Remington Improvement Association, the Charles Village Civic Association, and the Remington Neighborhood Alliance. In accordance with the Ordinance, the Committee would have an opportunity to comment on plans for

Petitioners have standing requires a comparison of their aggrievement to any aggrievement of a person outside of Charles Village and Remington," not within it. In essence, they ask us to define these two neighborhoods as the aggrieved class.

To justify this position, Petitioners look to *Alvey v. Hedin*, a case involving the rezoning of 4.75 acres from agricultural to commercial for the purpose of building a marina. 243 Md. at 336, 221 A.2d at 63. The two protestants in *Alvey* lived 250 feet across from the proposed marina and had beer cans, toilet paper, and other refuse float onto their property. *Id.* at 338, 221 A.2d at 64. After quoting the general rule that standing is only awarded to those who can show special aggrievement, we found both protestants to be within the "aggrieved class." *Id.* at 339, 221 A.2d at 64 (quoting *DuBay*, 240 Md. at 185, 213 A.2d at 489–90). We reasoned that the protestants were specially aggrieved "because their closeness to the marina property, their special problems with lights and noise as well as with the refuse emanating from the operation of the marina, make the effect of this commercialization on them different from its effect upon members of the public generally." *Id.* In Petitioners' view, *Alvey* "established that the fact that two neighbors may suffer the same aggrievement does not preclude either neighbor from being specially aggrieved."

To further support their thesis that the scope of the aggrieved class entitled to standing should have been these neighborhoods, Petitioners analogize this case to special exception or conditional use cases. In support of that argument, they quote *Md. Overpak Corp. v. Mayor of Balt.*, where we noted that "a PUD partakes more of the characteristics of a conditional use than any other zoning construct or mechanism recognized in Baltimore City." 395 Md. 16, 30, 909 A.2d 235, 243 (2006). They argue that "[c]ourts routinely analyze neighborhoods in special exception or rezoning cases." Moreover,

---

improvement submitted to the Planning Commission. These comments "shall be advisory to the Department of Planning and the Planning Commission."

they point out that the PUD section in the Baltimore City Code mentions the term "neighborhood" as well: it provides that a PUD may not "adversely affect the surrounding neighborhood." Balt. City Rev.Code, Zoning § 9–112(b)(2) (2010). Thus, Petitioners conclude that, because of the focus on the concept of "neighborhood" in conditional use cases and the Zoning Code, we should use it in defining an aggrieved party as well.

Respondents counter that both the Circuit Court and the Court of Special Appeals were correct to rely on the well-established standard set forth in *Bryniarski*, under which a person must show "that he is personally and specially affected in a way different from that suffered by the public generally." 247 Md. at 144, 230 A.2d at 294. Using this standard, Respondents argue that "[a]ggrievement is analyzed based on whether an **individual** is specially and adversely affected by a zoning decision—not whether a neighborhood is affected." To support this assertion, Respondents cite several cases—including *Marcus, White, DuBay,* and *Wilkinson*—and argue that this Court has denied protestants aggrieved status even when they lived in the same community or neighborhood as the rezoning action.

■ We agree with Respondents that the creation of a class of aggrieved persons is done on an individual scale and not based on delineations of city neighborhoods.[10] *See Marcus,* 235 Md. at 538, 541, 201 A.2d at 779, 781 (denying standing to property owner 0.75 miles from site because "[t]here is no evidence that his home is within sight of the subject properties nor that the proposed rezoning would have any effect whatever on it except such effect as all other residential properties in the whole Wheaton and Glenmont area of Montgomery County might suffer"); *see also DuBay,* 240 Md. at 183, 213 A.2d at 489 ("[I]n addition to showing the proximity of one property to the other, [standing] requires proof of the adverse effect the

---

10. Baltimore City publishes an interactive map showing city neighborhoods, including Charles Village and Remington. *See* http://maps. baltimorecity.gov/imap/imap_1.aspx.

changed status of the rezoned property has, or could have, on the use, enjoyment and value of the property of the protestant in order to establish the status of the appellant as an aggrieved person.").[11] As we sketched out above, with the exception of those protestants who are *prima facie* aggrieved, the requirement that an individual prove special aggrievement has been well-established for more than half a century. We are not aware of any case in which this Court has deviated from that standard.

Indeed, even *Alvey*, the case relied on by Petitioners, supports this holding. There, in referring to the "aggrieved class," the Court was using the word "class" to mean a category of individuals who showed special aggrievement different from the general public. It was not referring to the whole neighborhood or even numerous people. Instead, the aggrieved class consisted of the two individuals who were able to show that they were specially aggrieved by virtue of the detritus deposited on their shores.

*Alvey* does not support Petitioners' argument because Petitioners' theory depends on subtracting individual special aggrievement from the analysis—it assumes that every member of the neighborhood is automatically specially aggrieved. By comparing everyone inside the neighborhood to everyone outside of the neighborhood, there is no chance for the Court to examine whether the people inside the neighborhood are in fact specially aggrieved. Even Petitioners acknowledge that "[t]he neighborhood could include an individual who is not

---

**11.** The *DuBay* Court further explained:
> None of them showed that . . . the reclassification[ ] would cause him or her any unique or special kind of damage other than that suffered by the whole community. . . . DuBay is the nearest (a distance of 1500 feet) to the reclassified property, but his property is on the opposite side of the Beltway, which, if not a complete shield against the apartments to be constructed, will serve as an adequate barrier. . . . Aiken and Rice both reside a considerable distance (more than four-tenths of a mile) and possibly out of sight of the proposed apartments. And, which is more important, none of the appellants were able to show that the value of their respective property would be adversely affected.
>
> *DuBay v. Crane*, 240 Md. 180, 185–86, 213 A.2d 487, 490 (1965).

aggrieved." Yet, under Petitioners' proposed definition of an "aggrieved class," this non-aggrieved person would still be given standing, a result at odds with our jurisprudence, which requires proof of harm to the individual.

Petitioners' reliance on cases in which courts have analyzed neighborhoods in rezoning cases and to the governing standards of the Zoning Code is also misplaced. Neither the Code nor the cases apply to the issue of standing to support judicial review. Rather they apply to the merits at issue—whether a rezoning action was properly granted or denied. *Certiorari* was sought and granted here not on the question of whether the PUD should have been approved, but whether Petitioners had standing to seek judicial review of the decision of the City Council. These diverse issues call for different legal standards, and standing issues are "determined by the courts on a case by case basis, and the decision in each case rests upon the facts and circumstances of the particular case under review." *Bryniarski*, 247 Md. at 144, 230 A.2d at 294.

Creating a bright-line rule, under which each person in the entire neighborhood qualifies as a member of the specially aggrieved class in every PUD case, as Petitioners propose, would be tantamount to abandoning the *Bryniarski* rule that the facts and circumstances of each case would govern.[12] We decline to adopt such a bright-line rule. Instead, we will examine the specific facts alleged to show aggrievement in this case and compare that injury to harm suffered by the general public.

### Petitioners' Claims of Special Aggrievement

The second issue before this Court is whether "the unique adverse effects caused by a new type of large development on 11.5 acres in an urban neighborhood" were sufficient to accord Petitioners standing as specially aggrieved persons. This

---

12. This is not to say that there can never be a case where an entire neighborhood is aggrieved. But no facts, specific to this case, have been presented which show that the entire neighborhoods of Remington and Charles Village are specially aggrieved.

question is simply another way of asking whether Petitioners have met their burden of showing special aggrievement.

█ █ In determining whether Petitioners have met their burden of showing special aggrievement, we remain aware of the appropriate standard of review. In this case, the Circuit Court converted the motions to dismiss into motions for summary judgment by considering materials outside of the pleadings, including Petitioners' affidavits. *See* Md. Rule 2–322(c); *120 W. Fayette St., LLLP v. Mayor of Balt.*, 407 Md. 253, 263, 964 A.2d 662, 667 (2009). When this Court reviews the granting of a motion for summary judgment, "we must consider whether a dispute of material fact existed and whether the trial judge was legally correct." *Comm. for Responsible Dev. on 25th St. v. Mayor of Balt.*, 137 Md.App. 60, 74, 767 A.2d 906, 913 (2001) (citations and quotation marks omitted).

### *Petitioners' Proximity to the PUD*

█ Petitioners concede that they are not *prima facie* aggrieved as they both reside approximately 0.4 miles from the PUD. Thus, to establish special aggrievement through proximity, Petitioners must still reside close enough to the rezoning action to be considered almost *prima facie* aggrieved and then show some additional evidence of harm. *DuBay*, 240 Md. at 183, 213 A.2d at 489 ("[I]n addition to showing the proximity [, the law] requires proof of the adverse effect. . . ."). Although there is no bright-line rule for who qualifies as "almost" *prima facie* aggrieved, we have found no cases, in which a person living over 2000 feet away, has been considered specially aggrieved. Rather, as we discussed above, this category has been found applicable only with respect to protestants who lived 200 to 1000 feet away from the subject property. *See Habliston*, 258 Md. at 352, 354–55, 265 A.2d at 885–87 (protestants held specially aggrieved when 200 to 500 feet from site; owner testified regarding decrease in value); *Chatham*, 252 Md. at 579–80, 584, 251 A.2d at 2, 4 (protestants with proximity of 1000 feet, within the same subdivision who could see site of zoning change were specially aggrieved).

On the contrary, protestants who lived more than 1000 feet from the rezoning site have repeatedly been denied standing. *See Shore Acres,* 251 Md. at 312, 317–18, 247 A.2d at 403, 406 (not specially aggrieved when 3760 feet and out of sight of subject property); *White,* 251 Md. at 64, 246 A.2d at 250–51 (not specially aggrieved when 0.5 miles from site, even though asserting an increase in traffic, increase in use of water system, and overcrowded schools); *DuBay,* 240 Md. at 182–84, 185–86, 213 A.2d at 488–90 (three protestants—1500 feet, 0.4 miles, and 0.9 miles—who were separated by beltway or could not see site, not specially aggrieved); *Marcus,* 235 Md. at 537–38, 541, 201 A.2d at 778–79, 781 (protestant living 0.75 miles away who could not see subject property denied standing); *25th Street,* 137 Md.App. at 86, 89, 767 A.2d at 920, 922 (protestant two blocks west and three blocks north, without sight of, or sound from, subject property, denied standing).

Petitioners attempt to distinguish these precedents based on the large urban nature of the PUD involved here. Yet, nowhere in any of Petitioners' briefs do they explain the significance, for standing purposes, of the urban PUD, as compared with suburban or rural locales. We can only suppose that Petitioners posit that an urban PUD expands the proximity factor so that individuals challenging a large urban development are permitted to reside farther away from the PUD than non-urban protestants. We find no support in our earlier decisions, and Petitioners have offered none, for the proposition that the urban nature of the PUD affects the proximity analysis for special aggrievement purposes. Nor do we see how the size of the PUD renders standing requirements more lenient in analyzing proximity.

### Petitioners' Claims of Direct and Specific Harm

Protestants, who reside far away from the rezoned site and cannot establish special aggrievement through proximity, can only look to the theoretically recognized, but never before found in fact, third category of standing that requires a showing that the reclassification produces a harm directly and specifically impacting their property. *See Bryniarski,* 247 Md. at 145, 230 A.2d at 295. Petitioners seek to do this in

three ways: (1) by showing that they will suffer harm from a change in the character of the neighborhood as a result of the PUD; (2) by arguing that they will be directly and specifically impacted by the increased traffic, and (3) by alleging direct and specific harm from the PUD's visibility.[13]

### Change in Character of Neighborhood

 Petitioners find harm in the change in the character of the neighborhood they say will result from the PUD, specifically the planned Wal–Mart. To support this proposition, they cite *Bryniarski*, 247 Md. 137, 230 A.2d 289, and *Wier*, 257 Md. 600, 263 A.2d 833, two cases in which the protestants were granted standing. In *Bryniarski*, this Court noted that one of the protestants "expressed his belief that his property would be injured by . . . the change in the nature of the use of land in the area." 247 Md. at 148, 230 A.2d at 296. Likewise, in *Wier*, this Court stated that "[t]here was considerable testimony as to . . . change in the nature of the use of land in the area." 257 Md. at 613, 263 A.2d at 839.

Respondents contend that this reliance on *Bryniarski* and *Wier* is misplaced because those "courts held that the protestants were *prima facie* aggrieved based on their proximity to the proposed developments." Respondents cite several cases—including *White*, *DuBay*, *Wilkinson*, and *25th Street*—to support their assertion that this Court has denied standing to protestants who allege a change in the character of the community, in the absence of proximity.

Respondents' contention finds stronger support in our decisions. We have found no cases in which a protestant who lacked proximity to the rezoning action was granted standing based on a claim of change in the character of the neighborhood. As Respondents correctly point out, *Bryniarski* and *Wier* are distinguishable because those cases dealt with *prima facie* aggrievement. *See Bryniarski*, 247 Md. at 146–47, 230 A.2d at 295–96; *Wier*, 257 Md. at 613, 263 A.2d at 839.

---

13. The last two arguments (increased traffic and the PUD's visibility) were made by Petitioner Ray only.

Although both cases mentioned a change in the character of the neighborhood, the primary basis for their holdings was the protestants' proximity, a circumstance not present in the current case.

Contrary to Petitioners' argument, the weight of authority indicates that claims of change in the character of the neighborhood by protestants who lack proximity are insufficient to prove special aggrievement. *See White*, 251 Md. at 64, 246 A.2d at 250–51 (protestant who lived 0.5 miles away and alleged a change in the character of the community was not specially aggrieved); *Wilkinson*, 242 Md. at 233–34, 218 A.2d at 505–06 (protestant who lived 750 feet in a straight line, or 0.7 miles by road, and alleged a drastic change in the neighborhood was not specially aggrieved); *25th Street*, 137 Md. App. at 87–89, 767 A.2d at 920–21 (protestant who lived two blocks west and three blocks north and alleged change in historic nature of neighborhood was not specially aggrieved).

Petitioners' allegations of change in the neighborhood are not sufficient to show special aggrievement because they fail to identify a harm that directly impacts their properties. They complain that the commercial establishments now existing in their neighborhood, such as Waverly Ace Hardware, Eddie's Market, and Safeway Supermarket, will close because of competition from Wal–Mart, and that they will become vacant buildings, which are detrimental to a community. Yet, Petitioners have failed to show that any of these businesses, whether open or closed, affect them in a manner distinct from the general public.

We return to the historical roots of zoning, *i.e.* the law of nuisance, to explain why standing is denied under this circumstance. As Restatement (Second) of Torts § 821C explains, for a "private individual [to] recover in tort for a public nuisance[, he must have] suffered harm of a different kind from that suffered by other persons exercising the same public right." Restatement (Second) of Torts § 821C cmt. b (1979). Moreover, "[i]t is not enough that he has suffered the same kind of harm or interference but to a greater extent or degree." *Id.* The Restatement gives the following illustration:

[W]hen a public highway is obstructed and all who make use of it are compelled to detour a mile, no distinction is to be made between those who travel the highway only once in the course of a month and the man who travels it twice a day over that entire period. For both there has been only interference with the public right of travel and resulting inconvenience, even though the interference and the inconvenience have been much greater in the one case than in the other.

*Id.* The Restatement maintains there is a good reason courts refuse to grant standing based on differences in degree of harm: it is "the difficulty or impossibility of drawing any satisfactory line for each public nuisance at some point in the varying gradations of degree, together with the belief that to avoid multiplicity of actions[,] invasions of rights common to all of the public should be left to be remedied by action by public officials." *Id.*

In this case, the interests of the general public were considered at the time of the public hearings considering this project. As Respondents say: "The process pursuant to which the City approved the zoning authorization necessary for the reuse of the property involved numerous reviews, meetings and public hearings in which several community members were heard before both the City Council's Land Use Committee and Baltimore City Planning Commission." Judicial review is only offered to individuals who are specially aggrieved. Special aggrievement is what Petitioners have not been able to show.

### Increased Traffic

Second, Petitioner Ray argues that he has standing to sue based on his belief that the PUD would increase traffic, making it more dangerous for him to drive because of the narrow streets in the area. To support this claim, Ray cites *Bryniarski*,[14] where the Court noted that protestants had

---

**14.** Petitioner actually cites *Sugarloaf Citizens' Ass'n v. Department of Environment,* 344 Md. 271, 686 A.2d 605 (1996). This case, however,

testified about "the alleged adverse effect of additional traffic" and their "belief that [their] property would be injured by the increase in traffic." 247 Md. at 148, 230 A.2d at 297. But, again, *Bryniarski* dealt with *prima facie* aggrievement. *Id.* at 146–47, 230 A.2d at 296. The basis for the Court's holding was the protestant's close proximity, not the claim of increased traffic.

Respondents emphasize that Ray "fail[s] to identify a single case in which a property owning protestant was found to be aggrieved based on the threat of increased traffic." They aver that "this Court has expressly rejected" the idea that standing can be based on a claim of increased traffic. To support this assertion, Respondents cite several cases—including *Wilkinson, Marcus, DuBay,* and *White*—in which this Court denied standing to protestants who alleged increased traffic.

We concur with Respondents. We have uncovered no cases, and Ray has cited none, where a protestant who was 0.4 miles from the rezoned property was granted standing based on a claim of increased traffic. On the contrary, there is an overwhelming weight of authority that claims of increased traffic, by protestants who lack close proximity, are insufficient to prove special aggrievement. *See, e.g., Shore Acres,* 251 Md. at 318, 247 A.2d at 406; *Wilkinson,* 242 Md. at 234–35, 218 A.2d at 506; *White,* 251 Md. at 64, 246 A.2d at 250–51; *DuBay,* 240 Md. at 183–84, 185, 213 A.2d at 489; *Marcus,* 235 Md. at 537–38, 541, 201 A.2d at 779, 781. Thus, Petitioner Ray's claim of increased traffic is not sufficient to show special aggrievement. Instead, the increased traffic alleged by Petitioner has a common affect upon the public and produces only a general aggrievement.

### Visibility

 Ray also argues that he has standing because he can see the PUD from his second-floor bathroom window during

___

only discusses increased traffic by citing *Bryniarski*. *See Sugarloaf Citizens' Ass'n,* 344 Md. at 295, 686 A.2d at 617. We understand Petitioner's argument that standing can be based on increased traffic, therefore, to be based on *Bryniarski*.

the winter months. Here, Ray relies on *Wilkinson,* in which this Court recognized that "[v]isibility is one of the elements of proximity, and ... has been referred to as one of the factors giving rise to standing." 242 Md. at 235, 218 A.2d at 506.

Respondents also rely on *Wilkinson,* but for a different proposition: "mere visibility is not enough to give the requisite standing." *See id.* In this regard, Respondents argue that Ray has not cited "a single case where someone living .4 of a mile away from a development project was specially aggrieved simply by being able to see the project." Respondents cite *Wilkinson* and *DuBay* and argue that this Court has denied standing to protestants "who lived as close or closer to their proposed developments than Ray is from [the PUD], and who could see the projects from their residences."

We have found no cases where a protestant, who lacked proximity to the rezoning action, was granted standing based on a claim of such limited visibility. Quite the opposite, such claims have been rejected as insufficient to show special aggrievement. *See Wilkinson,* 242 Md. at 235, 218 A.2d at 506 ("Of itself, however, where as here, the visibility is only across a broad beltway, and there is no probative evidence of any other specific interest or damage to the use or value of the protestant's property, mere visibility is not enough to give the requisite standing."). In any event, our recognition of visibility as a basis for standing in prior cases is not as far-reaching as Ray would like. It requires much more than his limited visibility through only one window in a second-story bathroom, and even then, only during the winter months. This kind of visibility is de minimis, not substantive, and falls far short of showing the kind of harm that will entitle a person to judicial review. When one practically has to use a telescope to prove his harm from a rezoning, he has failed to show special aggrievement based on that harm.

### Lay Opinion Testimony of Decreasing Property Values

Finally, Petitioner Coyne makes an evidentiary argument. He maintains that he has standing because the development of the PUD will adversely affect the value of his

property, but the Circuit Court ruled such testimony inadmissible. Because the Circuit Court did not consider Coyne's testimony, this claim of aggrievement requires a different analysis than the others. Our review is focused not on whether the evidence was sufficient to show special aggrievement, but whether the Circuit Court was legally correct in ruling that an owner's lay opinion testimony about future fluctuations in the value of his property is inadmissible.

There does not appear to be any Maryland case directly on point. Both parties cite the same case in their briefs, *Brannon v. State Roads Commission of the State Highway Administration*, 305 Md. 793, 506 A.2d 634 (1986). In that case, this Court held that an owner of property in a condemnation case was permitted to express her lay opinion as to the before-and-after-taking value of the property. *Id.* at 800–01, 506 A.2d at 638. The Court explained that "the owner of the property is presumptively competent to express his opinion of its value" because he is "presumed to have sufficient knowledge of the price paid, the rents or other income received, and the possibilities of the land for use." *Id.* at 801–02, 506 A.2d at 638–39 (citation and quotation marks omitted).

Under Coyne's reading of the case, it stands for the general proposition that property owners are always permitted to testify about the value of their property, including any future depreciation in value. Respondents adhere to a different view. They argue that *Brannon* establishes only that a property owner can testify about the property's current value, but that any future speculation about a potential adverse affect caused by a development 0.4 miles away is within the specialized knowledge of an expert.

We agree with Respondents that testimony about whether the value of a property will increase or decrease because of a future development 0.4 miles away requires expert testimony. In *Brannon*, the owner was permitted to testify about the before-and-after-taking value of her property because she was personally familiar with her property both before and **after** the taking. *Id.* at 799–802, 506 A.2d at 637–39 (emphasis

added). But in this case, Coyne sought to testify about what he believed would be the value of his home sometime into the future, after the PUD is developed. This is a crucial difference.

Unlike the owner in *Brannon*, who was familiar with her property because the taking had already occurred, Coyne is not familiar with the value of his property after the PUD is developed, because that is only a future prospect. Thus, Coyne is merely speculating without "a reasonably good idea of what [the property will be] worth." *Id.* at 802, 506 A.2d at 639 (citation and quotation marks omitted). Adopting Coyne's position would require that we abandon the very justification for the treatment of property owners as presumptively competent to testify about the value of their property. We refuse to do that.[15]

## CONCLUSION

We hold that the Circuit Court was correct in dismissing Petitioners' Petition for Judicial Review. The aggrieved class continues to be limited to those individuals who can show by specific facts that they have been specially aggrieved in a manner different than the public generally. Petitioners failed to allege such facts.

## JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONERS TO PAY COSTS.

---

**15.** This holding appears to be in line with states that have handled this issue, although the decisions we found tend to be from lower courts. *See, e.g., Lindsey Creek Area Civic Ass'n v. Consol. Gov't of Columbus,* 249 Ga. 488, 292 S.E.2d 61, 64 (1982) (holding that an owner's lay testimony about the decrease in property value is not sufficient to grant standing); *Jaffe v. Zoning Bd. of Appeals,* 34 Mass.App.Ct. 929, 612 N.E.2d 693, 694 (1993) ("If diminution of value were [protestant's] only complaint, his expression of belief that the property had diminished in value may not have been sufficient to avoid summary judgment."). *But see Fort v. Cnty. of Cumberland,* —— N.C.App. ——, 721 S.E.2d 350 (2012) (holding that owner's lay opinion testimony of decreasing property value was sufficient to establish standing).