*Anne Arundel County, Maryland v. Steve Bell*, No. 29, September Term, 2014

**Zoning—Comprehensive Zoning—Legislative Action—Litigation—Standing**

Plaintiffs wishing to challenge in Maryland courts the legislative action adopting a comprehensive zoning ordinance are required to demonstrate taxpayer standing—a standing doctrine required for challenges to legislation. The doctrine of property owner standing (i.e., a proximity-driven standing doctrine) is not the appropriate basis upon which a judicial challenge to a comprehensive zoning legislative action may be maintained.

IN THE COURT OF APPEALS OF
MARYLAND

No. 29

September Term, 2014

ANNE ARUNDEL COUNTY,
MARYLAND, et al.

v.

STEVE BELL, et al.

Barbera, C.J.,
Harrell,
Battaglia,
Greene,
Adkins,
McDonald,
Watts,

JJ.

Opinion by Harrell, J.
Battaglia, Adkins, and McDonald, JJ.,
dissent.

Filed: April 21, 2015

Respondents in this matter, as plaintiffs, challenged in the Circuit Court for Anne Arundel County the adoption in 2011 by the County Council for Anne Arundel County of a comprehensive zoning ordinance for a large portion of Anne Arundel County. In order to maintain their litigation, they must demonstrate appropriate standing to do so. Respondents assert that property owner standing principles apply to a judicial challenge to comprehensive zoning legislation and that they satisfied those principles. We disagree. Plaintiffs wishing to challenge in Maryland courts the legislative action adopting a comprehensive zoning are required to demonstrate taxpayer standing. Respondents do not allege facts sufficient to meet the correct standing requirement. Thus, the dismissal by the Circuit Court of the two suits in the present case was correct. The contrary position taken by the Court of Special Appeals in this case must be reversed.

## I. STATEMENT OF THE CASE

Bill 12-11, a comprehensive zoning ordinance adopted in 2011 by the County Council for Anne Arundel County ("the County"), embraced Councilmanic Districts I and IV, comprising approximately 59,045 individual parcels or lots totaling 4,265 acres in area. The two Districts include most of the property in the vicinity of the Baltimore/Washington International/Thurgood Marshall Airport and all of the property along the Baltimore-Washington Parkway corridor in Anne Arundel County. Of those 59,045 individual parcels or lots, Bill 12-11 changed the previous zoning classifications of 264 parcels or lots and maintained essentially the pre-existing zoning of the rest. Bill 12-11 was the culmination by local government of a 5-year comprehensive and thorough consideration of the zoning in the Districts.

Bill 12-11 was challenged by various Anne Arundel County property owners and community associations ("the Citizens"),[1] who objected to some, but not all, of the rezonings. Two suits were filed in the Circuit Court for Anne Arundel County, which were consolidated ultimately. Titled *In the Matter of Steve Bell, et al.*, C-11-161930, the Citizens filed on 14 June 2011 an Amended Petition for Judicial Review or, in the Alternative, for a Writ of Administrative Mandamus ("Amended Petition for Judicial Review"). Styled as *Steve Bell, et al. v. Anne Arundel County, Maryland*, C-11-163163, the Citizens filed on 5 August 2011 a Complaint for Declaratory Judgment, in which they challenged the rezoning of multiple parcels of land, alleging that the County engaged in illegal spot and contract zoning with regard to those rezonings and failed to provide the public with the required notice of the proposed zoning changes.[2] Several Anne Arundel County property owners and ground leaseholders whose properties had been rezoned to

---

[1] The Respondents are comprised of the following individuals and entities: Steve Bell, William Chapin, Maria Murphy, Leslie Dolan, Sharon Miles, Rosie Shorter, Sandra Bowie, Robert Smith, Jerry Ballman, the Patuxent Riverkeeper, Canter Farms Home Owners Association, Inc., the Greater Crofton Council, Inc., and Crofton First (which may or may not be incorporated (*see infra* note 25)).

[2] The Citizens challenged the legality of Amendment 25 to Bill 12-11 and three rezoning proposals that were included in the original Bill: Proposals 4-4, 4-12, and 4-17. In part, Amendment 25 reclassified land from open space, rural agricultural, and low density residential zoning to mixed-use residential zoning. Proposals 4-4 and 4-12 reclassified land from low-density rural and low-density residential zoning to commercial zoning. Also, Proposal 4-17 reclassified a portion of one parcel from rural agricultural zoning to residential zoning.

At the hearing on Petitioners' motion to dismiss, the Citizens agreed ultimately to dismiss their claim that the County enacted Bill 12-11 without proper notice. As a result, United Properties, LLP, BWI Technology Park Phase III, LLC, Sincaltom Associates, and David Callahan, whose properties had been reclassified by Bill 12-11 and who had intervened as defendants, withdrew as parties from the case.

classifications desired by them (collectively, with the County, referred to as "Petitioners")[3] intervened to protect their interests. Petitioners moved to dismiss the Citizens' suit, arguing, *inter alia*,[4] that the Citizens lacked standing. Following a hearing, the Circuit Court granted Petitioners' motion to dismiss, concluding that the Citizens lacked standing because they failed to meet the burden of proving special aggrievement. Suggesting that being an adjoining, confronting, or nearby property owner is "[o]ne means of establishing a *prima facie* case of aggrievement in Maryland," the trial court emphasized that it could not find any reported Maryland cases in which "a party in a declaratory judgment action has been found to have *prima facie* aggrievement or standing to challenge comprehensive rezoning legislation based on ownership of property nearby or in proximity to property that was rezoned." Therefore, the Circuit Court concluded that the Citizens did not have *prima facie* standing to challenge Bill 12-11 through a declaratory judgment action. The hearing court also concluded that the Citizens' claims that the select rezonings would result in increases in traffic, decreases in property values, and changes in the character of the neighborhoods were insufficient to show special aggrievement because the court "fail[ed] to find that [the Citizens'] interests in the matter [were] any different than the interests of a member of the general public."

---

[3] The following parties intervened as defendants: BBSS, Inc., WACH, LLC, Towser Developers, Inc., South Shores Development Company, Inc., BWI Technology Park Phase III, LLC, Sincaltom Associates, David Callahan (the General Partner in Sincaltom Associates), and United Properties, LLP.

[4] Petitioners also argued that the Citizens failed (1) to state a claim upon which relief may be granted, (2) to exhaust administrative remedies, and (3) to join all necessary parties.

On direct appeal, the Court of Special Appeals disagreed with the Circuit Court, concluding that the Citizens enjoyed property owner standing to challenge Bill 12-11. *Bell v. Anne Arundel County*, 215 Md. App. 161, 79 A.3d 976 (2013). The Court of Special Appeals, relying on *120 W. Fayette St., LLLP v. Mayor and City Council of Baltimore*, 407 Md. 253, 964 A.2d 662 (2009) ["*Superblock I*"] and *Long Green Valley Association v. Bellevale Farms, Inc.*, 205 Md. App. 636, 46 A.3d 473, *aff'd on other grounds*, 432 Md. 292, 68 A.3d 843 (2013), rejected the County's contention that the *prima facie* aggrievement standard only applies to challenges to administrative land use decisions, concluding instead that it also applies to comprehensive zonings like Bill 12-11. *Bell*, 215 Md. App. at 180, 79 A.3d at 987; *see id.* at 179, 79 A.3d at 987 ("[W]e perceive no logical or practical reason why we should remove this case from the application of the principles espoused in [*Superblock I*] and *Long Green Valley* simply because [protestants] have challenged a comprehensive zoning ordinance, as opposed to another form of land use regulation or governmentally-imposed development control."). The intermediate appellate court determined that the property owner *prima facie* standard of presumed special aggrievement applies to judicial challenges to comprehensive zoning legislative actions, as well as quasi-judicial and other administrative land use actions generally.

The intermediate appellate court applied, in two stages, the *prima facie* aggrievement standard to Parcel 114 on Tax Map 37 ("Parcel 114"), which was reclassified from a lower density residential zone to one allowing commercial offices and similar uses. First, the court concluded that properties belonging to two of the Citizens

4

(William Chapin and Steve Bell) were close enough by distance to support "almost *prima facie* aggrievement" because they were located within approximately 500 feet of Parcel 114. *Bell*, 215 Md. App. at 184, 79 A.3d at 989–90. Second, the court examined whether the Citizens' "personal or property rights ha[d] been specially and adversely affected by the rezoning in a way different from those of the general public—what the *Ray* court called 'plus factors.'" *Bell*, 215 Md. App. at 183, 79 A.3d at 989 (citing *Ray v. Mayor and City Council of Baltimore*, 430 Md. 74, 85, 59 A.3d 545, 551–52 (2013)). Acknowledging that an increase in traffic, by itself, is insufficient to establish property owner standing, the court discussed the difference between an injury based on noise from increased traffic and an injury based on increased traffic in general, and concluded ultimately that the noise emanating from projected increased traffic and increased commercial activity was sufficient to show that the Citizens were specially aggrieved. *Bell*, 215 Md. App. at 186, 79 A.3d at 991.

Because that court concluded that at least one of the Citizens was *prima facie* aggrieved, based solely on the proximity of his/her property to a single property rezoned in Bill 12-11, all of the Citizens had standing with respect to the select parcels rezoned in Bill 12-11. *See Bell*, 215 Md. App. at 180–81, 79 A.3d at 987–88; *see State Center, LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 550, 92 A.3d 400, 458 (2014) (quoting *Board of Supervisors of Elections v. Smallwood*, 327 Md. 220, 233 n.7, 608 A.2d 1222, 1228 n.7 (1992) (quoting *Board of License Commissioners v. Haberlin*, 320 Md. 399, 404, 578 A.2d 215, 217 (1990) ("[W]here there exists a party having standing to bring an action or take an appeal, we shall not ordinarily inquire as to whether another party on the

5

same side also has standing."))). The Court of Special Appeals vacated the judgment of the Circuit Court and remanded the case for further proceedings. *Bell*, 215 Md. App. at 192–93, 79 A.3d at 994–95.

Petitioners, in their successful petition for a writ of certiorari to us, asked us to consider three questions:

> 1. Whether the *prima facie* aggrievement standard established in [*Bryniarski v. Montgomery County Board of Appeals*, 247 Md. 137, 230 A.2d 294 (1967)] should be expanded beyond challenges to administrative land use decisions to include challenges to comprehensive zoning?
>
> 2. Whether the "almost *prima facie*" standard as established in [*Ray v. Mayor and City Council of Baltimore*, 430 Md. 74, 59 A.3d 545 (2013)] should be expanded beyond challenges to administrative land use decisions to include challenges to comprehensive zoning?
>
> 3. Whether noise from a predicted increase in traffic constitutes "special damages"?

*Anne Arundel County v. Bell*, 437 Md. 422, 86 A.3d 1274 (2014) (granting certiorari). We answer the first two questions in the negative. Accordingly, no answer to the third question is necessary.

The first two questions are, at their core, one and the same: are the principles of property owner standing applicable to plaintiffs maintaining a judicial challenge to the adoption of a comprehensive zoning ordinance, as has been the standard by which judicial challenges to quasi-judicial and other administrative "land use" actions have been measured? We conclude that extending property owner standing to challenges to comprehensive zoning legislative actions is contrary to our case law, and unprudential as

6

well. The principles underlying property owner standing, heretofore applied to judicial review actions and other modalities of judicial challenges to quasi-judicial and other administrative land use decisions, should not be extended to apply to challenges to comprehensive zoning legislative actions. Comprehensive zoning on the one hand, and quasi-judicial or administrative land use actions on the other, are not similar sufficiently in process or justification to warrant extension by analogy of property owner standing principles from the latter to the former. Rather, taxpayer standing is the correct standing doctrine which Respondents/Plaintiffs must satisfy before they may be allowed to maintain a judicial challenge to comprehensive zoning legislation.[5]

## II. STANDARD OF REVIEW

We will treat the Circuit Court's grant of the County's motions to dismiss as a grant of summary judgment because the trial court considered materials (specifically, affidavits) outside the complaints (i.e., the complaints and documents attached thereto). *See* Maryland Rule 2-322(c); *see also Ray*, 430 Md. at 91, 59 A.3d at 555 (treating a motion to dismiss as a motion for summary judgment because the trial court considered materials outside of the pleadings); *Converge Services Group, LLC v. Curran*, 383 Md. 462, 475, 860 A.2d 871, 879 (2004) (noting that the "universe of 'facts' pertinent to the

---

[5] It is well-established that a judicial review action is not available as a vehicle to challenge a comprehensive zoning legislative action. *See MBC Realty, LLC v. Mayor and City Council of Baltimore*, 403 Md. 216, 240–42, 941 A.2d 1052, 1066–67 (2008); *Anderson House, LLC v. Mayor and City of Rockville*, 402 Md. 689, 707, 939 A.2d 116, 126–27 (2008); *Maryland Overpak Corp. v. Mayor and City Council of Baltimore*, 395 Md. 16, 50, 909 A.2d 235, 255 (2006). Thus, we are left to consider here the modalities of administrative mandamus and declaratory judgment.

court's analysis of the motion [to dismiss] are limited generally to the four corners of the complaint and its incorporated supporting exhibits, if any"). "Whether summary judgment as granted properly is a question of law. The standard of review is *de novo . . . .*" *Lightolier, A Division of Genlyte Thomas Group v. Hoon*, 387 Md. 539, 551, 876 A.2d 100, 108 (2005).

### III. QUASI-JUDICIAL AND ADMINISTRATIVE LAND USE DECISIONS VERSUS COMPREHENSIVE ZONING: A COMPARISON

The zoning process, broadly viewed, is designed to implement growth

> in a manner that allows for the expansion of economic activities and opportunities in the area or region for the benefit of its residents, while at the same time attempting to maintain the quality of life of the region, all without unduly disturbing the reasonable expectations of the citizenry as to the permissible uses they may make of real property.

*Mayor and Council of Rockville v. Rylyns Enterprises, Inc.*, 372 Md. 514, 532, 814 A.2d 469, 479 (2002). Decisions whether to zone or rezone properties are made by local zoning authorities in Maryland through three primary processes: establishment of original zoning through adoption of a zoning map, comprehensive rezoning of substantial areas of the jurisdiction through a legislative-type process initiated by the local government, and piecemeal rezoning of individual properties (by application of the owner or contract purchaser) through a quasi-judicial process. *See id.* Original and comprehensive zoning are accomplished solely through legislative processes culminating in legislative acts, while piecemeal rezoning is achieved through a quasi-judicial process leading to a technical legislative act. *Id.*

8

### A. Comprehensive Zoning

Comprehensive zoning "is fundamentally legislative and no significant quasi-judicial function is involved." *Montgomery County v. Woodward & Lothrop, Inc.*, 280 Md. 686, 713, 376 A.2d 483, 498 (1977), *see Rylyns Enterprises*, 372 Md. at 532, 814 A.2d at 479. As comprehensive zoning encompasses a large geographical area, the process is initiated generally by a local government, rather than by a property owner or owners. *Rylyns Enterprises*, 372 Md. at 535, 814 A.2d at 481. When local zoning authorities devise comprehensive zoning ordinances, the "focus is not on a single piece of property, but rather on a considerable number of properties as they relate to each other and to the surrounding area." *Woodward & Lothrop*, 280 Md. at 713, 376 A.2d at 498. These "are not adjudicative determinations affecting one property owned by one person, *but instead are classically legislative determinations* designed to affect local and regional needs and all property owners within the planning area." *Id.* (emphasis added). During the comprehensive zoning process, the local zoning authority (which typically is comprised of local legislators wearing perhaps a different governmental "hat" when acting as the local zoning body) considers broad policy considerations, including "whether the comprehensive rezoning takes into account future public needs and purposes; whether it is designed to provide an adequate potential for orderly growth in the future and to satisfy local and regional needs; and ultimately whether it bears the requisite relationship to the public health, safety and general welfare." *Id.* Comprehensive rezonings "are limited only by the general boundaries of . . . appropriate procedural and due process considerations." *Rylyns Enterprises*, 372 Md. at 533, 814

9

A.2d at 480 (quoting *White v. Spring*, 109 Md. App. 692, 696–97, 675 A.2d 1023, 1025 (1996)).  In order for an act of zoning to "qualify as proper comprehensive zoning" it must:

> 1) cover a substantial area; 2) be the product of careful study and consideration; 3) control and direct the use of land and development according to present and planned future conditions, consistent with the public interest; and, 4) set forth and regulate all permitted land uses in all or substantially all of a given political subdivision, though it need not zone or rezone all of the land in the jurisdiction.

*Rylyns Enterprises*, 372 Md. at 535, 814 A.2d at 481.  Once an act of comprehensive zoning is enacted properly, the "motives or wisdom of the legislative body" in adopting the zoning "enjoy a strong presumption of correctness and validity" and are not changed easily.[6]  *Rylyns Enterprises*, 372 Md. at 535–36, 814 A.2d at 481.

### B.  Quasi-Judicial Processes and Administrative Land Use Actions

Administrative land use actions, whether reached via quasi-judicial or executive processes, encompass a wide variety of things, including piecemeal rezonings, special exceptions, variances, and nonconforming uses, whether granted by local administrative

---

[6] Zoning, so established, may be changed thereafter

> by the zoning authority only by the adoption of a subsequent comprehensive rezoning, or, in the case of a piecemeal Euclidean zoning application, upon a showing that there was a mistake in the prior original or comprehensive zoning or evidence that there has been a substantial change in the character of the neighborhood since the time the original or comprehensive zoning was put in place.

*Mayor and Council of Rockville v. Rylyns Enterprises, Inc.*, 372 Md. 514, 535–36, 814 A.2d 469, 481 (2002).

10

hearing officers, boards of appeal, or the local legislative body by donning its land use authority "hat";[7] as well as licenses and permits issued by state and local administrative agencies.

Original or comprehensive zoning may be changed only by a subsequent comprehensive zoning or by a subsequent piecemeal zoning. *Rylyns Enterprises*, 372 Md. at 538, 814 A.2d at 483. Piecemeal zoning is accomplished by local zoning authorities through a quasi-judicial process. *Anderson House, LLC v. Major of Rockville*, 402 Md. 689, 708 n.17, 939 A.2d 116, 127 n.17 (2008). Notably, the act or decision reached through this quasi-judicial process is "*on individual, as opposed to general, grounds*, and scrutinizes a single property." *Id.* (emphasis added) (internal quotation marks omitted). The piecemeal zoning process is decidedly un-legislative in nature, except at the end: it includes typically a deliberative fact-finding process, which entails the holding of at least one evidentiary hearing (generally), factual and opinion testimony, documentary evidence, cross-examination of the witnesses, and objections to the weighing of evidence. *See id.* This process results in a particularized set of written findings of fact and conclusions of law as to the zoning proposal for the parcel or assemblage in question. In piecemeal zoning applications seeking Euclidian zones, including those involving potential conditional zoning (where lawful to do so), the

---

[7] Special exceptions, variances, and nonconforming uses granted by local administrative hearing officers, boards of appeal, or legislative bodies were designed as a response to "the imperfect nature of planning and zoning and the need for greater flexibility in responding to the impacts of these imperfections." *Rylyns Enterprises*, 372 Md. at 536–37, 814 A.2d at 482.

ultimate task of the zoning authority is to "make a factual determination, based on the evidence of record, as to whether there has been a change in the physical character of the neighborhood where the property is located or a mistake was made in the original zoning." *Woodward & Lothrop*, 280 Md. at 712–13, 376 A.2d at 498; *see Rylyns Enterprises*, 372 Md. at 539, 814 A.2d at 483–84. This rule, referred to as the "change-mistake rule," does not apply to changes in zoning made in a comprehensive zoning or the piecemeal grant of a planned unit development (or "floating zone"). *Rylyns Enterprises*, 372 Md. at 539, 814 A.2d at 483–84. The grant of a floating zone requires usually written findings of fact and conclusions of law explicating (in terms of evidence or record) how the application conforms to the statutory pre-requisites for the particular zone. *See Aubinoe v. Lewis*, 250 Md. 645, 653, 244 A.2d 879, 884 (1968).

Bearing in mind these differences between comprehensive zoning and administrative land use decisions and the processes through which they are reached, we turn now to examine the two standing doctrines available to complainants by which they might maintain suits regarding land use actions generally: the doctrines of property owner standing and taxpayer standing. As we shall demonstrate, property owner standing is reserved for challenges to land use decisions reached through quasi-judicial or administrative/executive processes, and taxpayer standing is the appropriate doctrine applied to available modalities of judicial challenges to land use actions reached via a purely legislative process, such as comprehensive zoning actions.

## IV. THE "AGGRIEVEMENT STANDARDS" OF PROPERTY OWNER STANDING

Taxpayer and property owner standing provide the "cause of action" standing sufficient for justiciability: "when asserted properly, [the doctrines] provide both the cause of action (or claim) and the right of the individual to assert the claim in the judicial forum." *State Center, LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 517–18, 92 A.3d 400, 439 (2014). The "principles of property owner standing in Maryland stem from the State's statutory zoning laws, which grant an 'aggrieved person' the right to challenge many zoning actions." *State Center*, 438 Md. at 522–23, 92 A.3d at 442. The property owner standing doctrine recognizes that certain owners of real property may be "'specially harmed' by a decision or action (usually related to land use) in a manner different from the general public." *State Center*, 438 Md. at 519, 92 A.3d at 440. Unless a complainant alleges a sufficient "special aggrievement," or is presumed to be aggrieved specially because of the subject property's location, he, she, or it has no standing to challenge the act but is instead "merely 'generally aggrieved,' in a similar manner as the rest of the public." *State Center*, 438 Md. at 521, 92 A.3d at 441.

We shall explain in greater depth the requirements of the property owner standing doctrine in Part IV.A of this opinion. Although we noted in 2014 in *State Center* that principles of zoning laws "permit eligible plaintiffs to invoke the jurisdiction of the courts to challenge a greater variety of 'land use decisions' and actions than thought to be the case previously," *State Center*, 438 Md. at 523, 92 A.3d at 442, this was not an invitation to hyper-extend property owner standing principles, but merely to recognize an evolving understanding of what may be deemed an administrative or executive land use

13

decision or action, beyond the traditional notion of the grant of a piecemeal application for rezoning, special exception, or the like. We elaborate on the outer limits of the variety of land use decisions to which property owner standing applies in Part IV.B. In Part IV.C, we explain why further expansion of the property owner standing doctrine to the purely legislative process and act of comprehensive zoning is unsupported by law and ill-advised.

### A. Property Owner Standing: What It Is

We discussed recently and at length property owner standing in several opinions. *See, e.g.*, *State Center*, 438 Md. 451, 92 A.3d 400, *Ray v. Mayor and City Council of Baltimore*, 430 Md. 74, 59 A.3d 545 (2013). In *Ray*, after the Baltimore City Council approved, pursuant to an owner-initiated application, a Planned Unit Development ("PUD" or floating zone), for an assemblage of parcels in Baltimore, a group of objecting Petitioners filed a petition for judicial review in the Circuit Court for Baltimore City to block the PUD, which included a proposed Wal-Mart Supercenter. *Ray*, 430 Md. at 77–78, 59 A.3d at 547. We analyzed property owner standing in the context of the initial grant of the PUD under Maryland Code (1957, 2010 Repl. Vol.), Article 66B, § 2.09(a)(1)(ii),[8] which provided that an appeal may be filed by any "person . . . aggrieved by: (i) [a] decision of the Board of Municipal and Zoning Appeals; or (ii) [a] zoning action by the City Council." *Ray*, 430 Md. at 80, 59 A.3d at 548. In determining

---

[8] This statute was recodified ultimately at Maryland Code (2012), § 10-501 of the Land Use Article. The requirement for "aggrievement" appears in various other section of the Land Use Article, as well as various local zoning ordinances.

14

what is meant in the statute by a person "aggrieved," we turned to *Bryniarski v. Montgomery County Board of Appeals*, 247 Md. 137, 144, 230 A.2d 289, 294 (1967). *Ray*, 430 Md. at 81, 59 A.3d at 549. *Bryniarski* provides two general principles that underlay any discussion of "special aggrievement":

> First, "[a]n adjoining, confronting or nearby property owner is deemed, *prima facie*, to be specially damaged and, therefore, a person aggrieved." Second, "[a] person whose property is far removed from the subject property ordinarily will not be considered a person aggrieved . . . [unless] he meets the burden of alleging and proving . . . that his personal or property rights are specially and adversely affected."

*Ray*, 430 Md. at 81, 59 A.3d at 549 (citations omitted) (quoting *Bryniarski*, 247 Md. at 145, 230 A.2d at 294–95). Examining those principles in *Ray*, we observed that the "standard is flexible in the sense that it is based on a fact-intensive, case-by-case analysis." *Ray*, 430 Md. at 81, 59 A.3d at 549. Reviewing comprehensively the facts of prior cases discussing property owner standing, *Ray* determined that proximity is "the most important factor to be considered" in such cases. *Ray*, 430 Md. at 82–83, 59 A.3d at 550. Although there is "no bright-line rule" for determining the perfect proximity for a property to be presumed to be specially aggrieved, *Ray*, 430 Md. at 83, 59 A.3d at 550, we provided two (perhaps three[9]) categories of protestants: "those who are *prima facie*

---

[9] We noted in *Ray* that dicta in Maryland cases suggests "a third, poorly-defined category of protestants with standing who, despite being 'far removed from the subject property,' may nevertheless be able to establish 'the fact that his personal or property rights are specially and adversely affected by the board's action.'" *Ray v. Mayor and City Council of Baltimore*, 430 Md. 74, 85–86, 59 A.3d 545, 552 (2013). While this point has been repeated in various other Maryland cases, we have yet to find this "'Higgs boson particle,' or determine even whether it exists in the material world." *State Center, LLC v.*

(Continued…)

15

aggrieved and those who are almost *prima facie* aggrieved." *Ray*, 430 Md. at 85, 59 A.3d at 551. Otherwise, protestants are "generally aggrieved" and do not have standing. *Ray*, 430 Md. at 85, 59 A.3d at 552. A protestant is *prima facie* aggrieved "when his proximity makes him an adjoining, confronting, or nearby property owner." *Id.*; 59 A.3d at 551. A protestant is almost *prima facie* aggrieved when "she is farther away than an adjoining, confronting, or nearby property owner, but is still close enough to the site of the rezoning action . . . *and* offers 'plus factors' supporting injury." *Id.*; 59 A.3d at 551–52. The category of almost *prima facie* aggrieved protestants has been found in our cases to apply only to those who have lived between 200 to 1000 feet away from the subject property, although there is no bright-line rule delineating such boundaries. *Ray*, 430 Md. at 91, 59 A.3d at 555.

### B. Property Owner Standing: When It Applies

As noted above, principles of zoning laws "permit eligible plaintiffs to invoke the jurisdiction of the courts [under the doctrine of property owner standing] to challenge a greater variety of 'land use decisions' and actions than thought to be the case previously." *State Center*, 438 Md. at 523, 92 A.3d at 442. This recent evolution may be traced to three opinions decided over the last six years where we pondered how expansively those principles justified applying the doctrine. The evolutionary extension of the applicability of property owner standing begins with the zombie-esque trilogy of *Superblock* cases.

---

(…continued)
*Lexington Charles Ltd. P'ship*, 438 Md. 451, 536, 92 A.3d 400, 450 (2014); *see Ray*, 430 Md. at 86 n.8, 59 A.3d at 552 n.8 (listing the cases which, as of that time, repeated the comment).

*See Superblock I*, 407 Md. 253, 964 A.2d 662, and *120 West Fayette St., LLLP v. Major and City Council of Baltimore*, 426 Md. 14, 43 A.3d 355 (2012) [hereinafter "*Superblock III*"] (collectively, along with *120 West Fayette St., LLLP v. Major and City Council of Baltimore*, 413 Md. 309, 992 A.2d 459 (2010) [hereinafter "*Superblock II*"], the "*Superblock Trilogy*").

The basic facts underlying the *Superblock Trilogy* are as follows: In 1999, the Baltimore City Council (the "City") adopted an urban renewal plan for the westside of downtown Baltimore. *Superblock I*, 407 Md. at 258, 964 A.2d at 665. In the process of implementing the urban renewal plan,[10] the City entered into a land disposition agreement ("LDA") with a developer that provided for the sale and development of approximately five blocks of properties in the westside of downtown Baltimore, collectively referred to as the "Superblock." *Superblock I*, 407 Md. at 259, 964 A.2d at 665. 120 West Fayette St., LLLP ("120 West Fayette") is a taxpaying entity owning property outside of, but immediately adjacent to, the Superblock area. *Id.* It is no exaggeration to say that, over the course of the *Superblock Trilogy*, 120 West Fayette fought "tooth and nail" to forestall (or re-shape) the fruition of the City's urban renewal implementation efforts.

---

[10] To implement the urban renewal plan, the Baltimore Board of Estimates delegated various "ministerial and administrative" functions to a nonprofit corporation called the Baltimore Development Corporation, Inc. (the "BDC"). *120 West Fayette St., LLLP v. Major and City Council of Baltimore*, 407 Md. 253, 259, 964 A.2d 662, 665 (2009). The City asserted that it instructed the BDC to "work with developers and interested groups regarding the development of the westside, prepare and issue requests for development proposals, arrange and attend meetings between developers and business owners, and coordinate financial assistance." *Id.*

17

In *Superblock I*, 120 West Fayette sought a declaratory judgment against the City, alleging that the LDA was illegal and *ultra vires*. *Superblock I*, 407 Md. at 259–60, 964 A.2d at 665. Critically, 120 West Fayette alleged that the City violated its Charter and laws by entering into an illegal LDA; 120 West Fayette did *not* challenge the adoption a decade earlier of the urban renewal plan itself, a purely legislative act. *Superblock I*, 407 Md. at 258, 964 A.2d at 664. The City moved to dismiss the complaint, and the Circuit Court granted the City's motion, concluding that 120 West Fayette failed to establish standing. *Superblock I*, 407 Md. at 260, 964 A.2d at 665. 120 West Fayette appealed.[11] *Id.*; 964 A.2d at 666. 120 West Fayette made two main appellate arguments: first, that they enjoyed taxpayer standing, and second, that they enjoyed property owner standing, being situated immediately adjacent to the Superblock properties. *Superblock I*, 407 Md. at 265, 964 A.2d at 668. The Court analyzed these arguments in two parts, addressing first the question of whether they had taxpayer standing to challenge the LDA.[12] *Superblock I*, 407 Md. at 265–69, 964 A.2d at 668–71. We concluded that the allegations contained in 120 West Fayette's complaint were sufficient to establish taxpayer standing as a matter of law because the complaint alleged that the City engaged in illegal or *ultra*

---

[11] 120 West Fayette filed timely an appeal to the Court of Special Appeals. Before that court could consider the case, we issued a writ of certiorari. *Superblock I*, 407 Md. at 260, 964 A.2d at 666 (citing *120 West Fayette v. Baltimore*, 405 Md. 290, 950 A.2d 828 (2008) (granting certiorari)).

[12] As a preliminary matter, we considered whether the Circuit Court treated the City's motion to dismiss as a motion for summary judgment. *Superblock I*, 407 Md. at 261–65, 964 A.2d at 666–68.

*vires* acts and that such acts would cause potentially 120 West Fayette pecuniary harm or an increase in taxes. *Superblock I*, 407 Md. at 269, 964 A.2d at 671.

In the next part of the opinion, the Court considered the property owner standing argument. *Superblock I*, 407 Md. at 269–73, 964 A.2d at 671–73. The Majority held "[a]lternatively" that 120 West Fayette enjoyed property owner standing as well. *Superblock I*, 407 Md. at 270, 964 A.2d at 671. This part of the Majority's opinion in *Superblock I* recognized the "common law requirement of personal and specific damage or 'aggrievement' [that] is embodied in Maryland's statutory [z]oning laws" and discussed the meaning of the term "aggrievement." *Superblock I*, 407 Md. at 270–71, 964 A.2d at 672. Relying on *Sugarloaf Citizens Ass'n v. Department of Environment*, 344 Md. 271, 297, 686 A.2d 605, 618 (1996), the Majority in *Superblock I* noted that the doctrine of property owner standing pertains to "actions for judicial review of administrative land use decisions." *Superblock I*, 407 Md. at 271, 964 A.2d at 672. Analogizing implicitly actions taken under urban renewal and procurement ordinances to administrative land use decisions, "[b]ecause land use . . . is at least one of the prime considerations with which an urban renewal plan is reasonably sure to be concerned," the Majority determined that "the principles that confer standing upon an adjoining, confronting or neighboring property owner to seek judicial review of land use decisions, logically extend to an adjoining, confronting or neighboring property owner that is challenging *a municipalities'* [sic] *allegedly illegal avoidance of urban renewal and*

19

*procurement ordinances.*"[13]  *Superblock I*, 407 Md. at 272, 964 A.2d at 673 (ellipses in original) (emphasis added) (internal quotation marks omitted).  This point bears repeating: the Court determined that the principles underlying the doctrine of property owner standing justified extending the doctrine to certain property owners wishing to challenge the *executive or administrative actions* of a municipality as it went about purportedly implementing an urban renewal plan.  The Court did not determine that those same principles justified extending the doctrine to property owners wishing to challenge the legislative act of adopting the urban renewal plan.  *See Superblock I*, 407 Md. at 258, 964 A.2d at 665; *see id.* n.1, 964 A.2d at 665 n.1.

---

[13] In relating its understanding of this quotation from *Superblock I*, the Dissent in the present case emphasizes the words "land use."  Dissent Slip Op. at 1.  The Dissent admits, however, that the Court "applied proximity standing because the protestants were challenging *land use decisions*."  Dissent Slip Op. at 1 (italics in original) (underline added).

The existence of a "decision" by an executive, administrative, or quasi-judicial body was critical to the Court's holding in *Superblock I*.  The phrase "land use" must be read in the context of the rest of the discussion, where the Court limited its holding to instances where property owners challenged a municipality's allegedly illegal avoidance of legislation pertaining to land use.  To interpret *Superblock I* otherwise is an over-extension of the limited holding of the Court.

The Dissent here concludes its discussion of *Superblock I* by stating, "[t]he Court did not ground its decision on the administrative nature of the land use decisions approving the Land Disposition Agreement."  Dissent Slip Op. at 2.  This conclusion summarizes a portion of *Superblock I* without regard for the context of the Court's antecedent discussion.  *Superblock I* did not need to specify that the *prima facie* aggrievement standard was applicable only because land use decisions were not executive, administrative, or quasi-judicial in nature because the Court had limited already its holding to situations in which a property owner challenged a municipality's allegedly illegal avoidance of urban renewal and procurement ordinances.  *Superblock I*, 407 Md. at 272, 964 A.2d at 673.

20

In the Third Act of the *Superblock Trilogy*, the Court limited the holding of *Superblock I*. *See State Center*, 438 Md. at 524, 92 A.3d at 443. 120 West Fayette attempted in *Superblock III* to challenge the execution of a Memorandum of Agreement (the "MOA") between the City and the Maryland Historical Trust (the "Trust") relating to the treatment of historic properties within the urban renewal area. *Superblock III*, 426 Md. at 17, 43 A.3d at 357. The plaintiffs sought in the Circuit Court a declaration of rights regarding the terms of the MOA. *Id.* The City, along with other Appellees, moved to dismiss 120 West Fayette's complaint, suggesting that 120 West Fayette did not have standing to bring the action, as it was neither a party to nor an intended beneficiary of the MOA, as a contract. *Superblock III*, 426 Md. at 17–18, 43 A.3d at 357. The Circuit Court agreed with the City and dismissed the complaint. *Superblock III*, 426 Md. at 18, 43 A.3d at 357. 120 West Fayette argued on appeal, among other things,[14] that it had standing to seek a declaration of rights with regard to the MOA because it retained the same taxpayer and property owner standing that it did when it challenged the LDA in *Superblock I*. *Superblock III*, 426 Md. at 25–35, 43 A.3d at 361–68.

120 West Fayette argued in *Superblock III* that it retained the same taxpayer standing from *Superblock I* because it paid City and State taxes and challenged executive acts taken by government officials that were illegal and *ultra vires*. *Superblock III*, 426 Md. at 25, 43 A.3d at 362. The Court disagreed, determining that *Superblock I* was

---

[14] 120 West Fayette argued also that it had "leftover" standing based on a footnote in *Superblock II*. *Superblock III*, 426 Md. 14, 26–27, 43 A.3d 355, 362 (2012). The Court did not find this argument persuasive. *Superblock III*, 426 Md. at 27, 43 A.3d 363.

"fundamentally distinguishable" from *Superblock III* because the complaint in *Superblock III* did not allege a violation of a City ordinance or the City Charter, but instead claimed a breach of a contractual provision of the MOA.[15] *Superblock III*, 426 Md. at 27–29, 43 A.3d at 363–64. Because 120 West Fayette did not allege a violation of legislative law, it was not eligible for taxpayer standing. *Id.*

Having determined that 120 West Fayette did not possess taxpayer standing, the Court in *Superblock III* turned to the plaintiff's property owner standing argument. 120 West Fayette argued that execution and interpretation of the MOA was a unique kind of action affecting land use because it provided a quasi-administrative body (the Trust) with control over demolition (or not) of historic (or arguably historic) structures in a

---

[15] The Court in *Superblock III* characterized the allegation of a violation of law as "necessary" to the holding in *Superblock I* that 120 West Fayette had taxpayer standing and the "alternative holding" that it had property owner standing as well. *Superblock III*, 426 Md. at 27–28, 43 A.3d at 363 (citing, from the section on taxpayer standing, *Superblock I*, 407 Md. at 268, 964 A.2d at 670 ("In our view, the allegations contained in 120 West Fayette's complaint are also sufficient to establish taxpayer standing . . . . 120 West Fayette's complaint specifically alleges that the LDA agreement is *in derogation of the Charter and laws of the City*." (emphasis added in *Superblock III*) (internal quotations omitted)) and citing, from the section on property owner standing, *Superblock I*, 407 Md. at 272, 964 A.2d at 673 ("[W]e conclude that the principles that confer standing upon an adjoining . . . property owner to seek judicial review of land use decisions, logically extend to an adjoining . . . property owner that is challenging . . . *illegal avoidance of urban renewal and procurement ordinances*." (emphasis added in *Superblock III*))). *Superblock I* should not be read to suggest that allegations of a violation of statutory law are necessary to maintain property owner standing. Such an understanding would be to add an element to the "test," contrary to our case law on the requirements of property owner standing. *See supra* Part IV.A. Rather, the allegation of a violation of statutory law was necessary to *Superblock I*'s analysis of property owner standing in the sense that the allegedly illegal executive implementation by the City through the MOA of a piece of legislation (adoption of the urban renewal plan) gave 120 West Fayette something to challenge. *Superblock I*, 407 Md. at 272, 964 A.2d at 673.

designated historic area.  *Superblock III*, 426 Md. at 26, 43 A.3d at 362.  As the execution of the MOA was a decision affecting land use, so the argument went, the alleged violation of its terms in turn allegedly "derive[d] from a quasi-land use decision." *Superblock III*, 426 Md. at 25–26, 43 A.3d at 362.  Thus, 120 West Fayette's property being located adjacent to the development site, it retained property owner standing, á la *Superblock I*.  *Id.*

The Court determined that the principles in *Superblock I* extending property owner standing to challenge the LDA executed in furtherance of the adopted urban renewal plan did not justify extending property owner standing to 120 West Fayette in *Superblock III* as the MOA was not a land use action by any means.  *Superblock III*, 426 Md. at 30, 43 A.3d at 365.  The Court, for standing analysis purposes, defined a land use decision "generally" as "a decision (typically an ordinance or regulation) enacted or promulgated by a legislative or administrative body for the purposes of directing the development of real estate." *Id.* (citing *Black's Law Dictionary* 958 (9th ed. 2009)).  The Court noted that in each instance in which *either* property owner standing *or* taxpayer standing was recognized as attributable to a complainant, the matter involved a "land use decision":

> [O]ur research discloses not a single case of this Court approving the grant of *tax-payer or adjacent landowner standing* to an individual or entity in any context other than a challenge to or pursuant to a land use decision, as that term is generally understood.  Indeed, in every case of this Court that we have found, the land use decision a party was seeking to challenge or enforce was either an ordinance, variance, reclassification, or special exception provided by a local zoning body, or a permit or license issued by an administrative agency.

23

*Superblock III*, 426 Md. at 30–31, 43 A.3d at 365 (emphasis added). The Majority

opined that the MOA could not be considered a land use decision because it was "not an

ordinance, variance or permit," it "[bound] only two parties (as opposed to the general

public)," it "was not enacted by a legislative or administrative body," and, "most

important, the MOA does not direct the use or development of real estate in the

Superblock." *Superblock III*, 426 Md. at 33, 43 A.3d at 366. The Majority opinion

catalogued all of the ways in which the MOA could not be considered a land use

decision, in order to demonstrate, generally speaking, that the MOA fell outside of the

defined category of circumstances in which *either* property owner standing *or* taxpayer

standing might be implicated.[16] The Majority in *Superblock III* did not state that all land

use decisions would provide complainants necessarily with either property owner

standing, taxpayer standing, or both. Rather, the opinion referred cursorily to a large and

varied category of "land use decisions" to illustrate that the MOA was not numbered

among them and no further—more careful—analysis was necessary to determine which

type of standing—if either—120 West Fayette might have enjoyed. Stating that the

MOA is not a land use decision (and thus not amenable to property owner or taxpayer

standing analysis) is not the equivalent of stating that all "land use decisions" (as

generally and vaguely defined in *Superblock III*) are eligible for *both* property owner *and*

---

[16] The Dissent in the present case reads incorrectly *Superblock III* as "adopt[ing] a broad definition of 'land use decision,'" which included legislative actions, concluding in turn that "proximity standing is not limited to administrative land use decisions, but also applies to legislative land use decisions like comprehensive zoning." Dissent Slip Op at 2–3. As demonstrated above, *Superblock III* referred instead "generally" to a category of land use decisions in which *either* property owner standing *or* taxpayer standing applied.

taxpayer standing. Ultimately, the Majority concluded that 120 West Fayette did not have standing to request a declaratory judgment regarding interpretation and enforcement of the terms of the MOA. *Superblock III*, 426 Md. at 37, 43 A.3d at 369.

A thorough consideration of the *Superblock Trilogy* figured in our reasoning in *State Center*, 438 Md. 451, 92 A.3d 400. *State Center* concerned the State Center Project, a $1.5 billion, multi-phase redevelopment project intended to replace aged and obsolete State office buildings with new facilities for significant State government office use and to revitalize an approximately 25-acre property owned by the State of Maryland in midtown Baltimore, all without burdening unduly the State's capital budget. *State Center*, 438 Md. at 473, 92 A.3d at 413. The Maryland Department of General Services ("DGS") and the Maryland Department of Transportation ("MDOT") (collectively, the "State Agencies") issued a Request for Qualifications ("RFQ") soliciting a Master Developer who would receive the exclusive right to negotiate with the State for the entire project and receipt of a long-term leasehold interest. *State Center*, 438 Md. at 475, 92 A.3d at 414. After extensive negotiations between DGS, MDOT, and the State Center, LLC, a prospective developer (collectively, the "appellants"), three main sets of agreements were executed: the Master Development Agreement (the "MDA"), the First Amendment to the MDA, and a collection of ground and occupancy leases between the State and State Center, LLC. *State Center*, 438 Md. at 474, 92 A.3d at 413. Fifteen plaintiffs (all taxpayers of the State and property owners in downtown Baltimore, many with available office space for rent) (hereinafter the "appellees") filed suit seeking a declaratory judgment against the State Agencies that the formative contracts for the

25

Project were void and an injunction to halt the Project. *Id.* In a "novella-length" opinion, *State Center*, 438 Md. at 472 n.**, 92 A.3d at 412 n.**, we considered, among a number of issues, whether the appellees had standing under either the property owner or taxpayer standing doctrines to maintain their suits. *State Center*, 438 Md. at 474, 92 A.3d at 413. We concluded ultimately that the appellees did not enjoy standing under the property owner doctrine, *State Center*, 438 Md. at 538, 92 A.3d at 451, but did as taxpayers.[17] *State Center*, 438 Md. at 583, 92 A.3d at 479.

Appellants in *State Center* argued that property owner standing was not available to the appellees because such standing is available "only to challenges of pure-bred land-use decisions, such as zoning and nuisance claims." *State Center*, 438 Md. at 522, 92 A.3d at 442. Because the claim did not concern a land-use decision, but was instead grounded on an alleged violation of the State Procurement statutory scheme, as the argument went, property owner standing did not apply. *Id.* We noted that, pursuant to the holdings and reasoning of the *Superblock Trilogy*, property owner standing was only applicable in instances of "land use decisions." *State Center*, 438 Md. at 525, 92 A.3d at 443–44. We then considered whether the MDA, the First Amendment, or the collection of ground and occupancy leases fell within the category of land use decisions implicating the doctrine of property owner standing. *Id.* We determined ultimately that the MDA

---

[17] Ultimately, we concluded that the claims of the plaintiffs were before the Circuit Court improperly, as barred by the doctrine of laches. *State Center*, 438 Md. at 610, 92 A.3d at 495.

and First Amendment were land use decisions for the purpose of property owner standing analysis, but that the occupancy and ground leases were not. *Id.*

We reasoned that, although the MDA and First Amendment were not "traditional land use regulations or ordinances," they were "formative contracts" that "govern[ed] the development of real estate at the State Center." *State Center*, 438 Md. at 525, 92 A.3d at 444. The principles that justified applying the property owner standing doctrine in *Superblock I* compelled us to extend property owner standing to matters such as where the MDA governed the development of real estate. *Id.* (quoting *Superblock I*, 407 Md. at 272, 964 A.2d at 673 ("[T]he principles that confer standing upon an adjoining, confronting or neighboring property owner to seek judicial review of land use decisions, logically extend to an adjoining, confronting or neighboring property owner that is challenging *a [Government's] allegedly illegal avoidance of . . .* procurement ordinances [or statutes]." (alterations added in *State Center*) (emphasis added) (citations omitted) (internal quotation marks omitted))). Critically, negotiation and execution of the MDA (and, accordingly, the First Amendment) was considered rightly an executive function, being an agreement entered into by the State Agencies. In contrast, we suggested that the ground and occupancy leases did not constitute land use decisions as such because they did not "direct the development of any real property." *State Center*, 438 Md. at 526, 92 A.3d at 444. Just as in *Superblock III*, this comment does not endorse the conclusion that just "land use decisions" "direct[ing] the development of any real property" warrant testing according to property owner standing; rather, the comment suggests that the

ground and occupancy leases simply fall outside of the universe in which the doctrine of property owner standing *might* be implicated. *Id.*

As demonstrated by *Superblock I*, *Superblock III*, and *State Center*, the doctrine of property owner standing may apply to administrative land use decisions and other land use actions undertaken as executive functions. We have not applied heretofore the doctrine to purely legislative processes and actions, nor does our body of case law on the subject warrant applying the doctrine to judicial challenges to legislative acts reached through solely legislative processes.

### C. *Property Owner Standing: Why Extending It Further Is Ill-Advised*

It takes scant imagination to foresee the problems that would arise if complainants may satisfy the judicial requirement of standing based on the doctrine of property owner standing when challenging comprehensive zoning ordinances. As noted above, the comprehensive zoning ordinance at issue here examined approximately 59,045 discrete parcels or lots spread across 4,265 acres of Anne Arundel County. Of those 59,045 parcels or lots, the pre-existing zoning classifications for 264 individual parcels or lots were changed. If one of those reclassifications were found to be improper, do all fall because the overall process was a comprehensive one? How might severability be approached, if at all?[18] If the Citizens' understanding of property owner standing was

---

[18] There is no severability provision in Bill 12-11. It is unclear whether § 1-210 of the General Provisions Article of the Maryland Code (or its immediate predecessor, Md. Code (1957, 2011 Repl. Vol.), Article 1, § 23), although applicable to state statutes, applies to ordinances enacted by local governments. Maryland Code (2014), General Provisions Article, § 1-210(b) ("*When part of statute found to be unconstitutional or*

(Continued…)

correct, a protestant who wishes to challenge a comprehensive zoning ordinance would be deemed "specially aggrieved" merely because the person or entity owns property "adjoining, confronting or nearby" a target property (*prima facie* aggrieved) or owns property slightly farther away (generally speaking, between 200 to 1000 feet away from a

(…continued)

*void*.—The finding by a court that part of a statute is unconstitutional or void does not affect the validity of the remaining portions of the statute, unless the court finds that the remaining valid provisions alone are incomplete and incapable of being executed in accordance with the legislative intent."). Section 1-210 appears to be merely a codification of the common law principle that courts presume that an enactment is severable unless it appears that the legislative body intended otherwise. *See Park v. Board of Liquor License Com'rs for Baltimore City*, 338 Md. 366, 382, 658 A.2d 687, 695 (1995); *see also Board of Supervisors of Elections of Anne Arundel Co. v. Smallwood*, 327 Md. 220, 245–46, 608 A.2d 1222, 1234–35 (1992). The common law principle has been applied by courts in cases where local ordinances were involved, *see Montrose Christian School Corp. v. Walsh*, 363 Md. 565, 596–97, 770 A.2d 111, 129–30 (2001) (severing a portion of a Montgomery County ordinance regarding discrimination); *City of Baltimore v. Stuyvesant Ins. Co.*, 226 Md. 379, 390–93, 174 A.2d 153, 158–60 (1961) (discussing severability of a Baltimore City ordinance regarding bail bonds); *State v. Phillips*, 210 Md. App. 239, 268–69, 63 A.3d 51, 68–69 (2013) (noting that portions of a Baltimore City ordinance regarding gun registration could be severed if found to be invalid), but none involved legislation adopting a comprehensive zoning.

Thus, the question lingers—is the comprehensive nature of the inter-related policy decisions underlying a comprehensive zoning a contra-indication that the legislative body did not intend severability to be available?

The Anne Arundel County Code contains a severability provision in the "Definitions; Rules of Construction; Citation" title of the General Provisions Article similar to that of the Maryland Code discussed above. Anne Arundel County Code (2005), Article 1, § 1-1-106 ("Severability. If any word, phrase, clause, sentence, paragraph, or section of this Code is declared invalid or unconstitutional by a court of competent jurisdiction, the invalidity or unconstitutionality shall not affect any of the remaining words, phrases, clauses, sentences, paragraphs, or sections of this Code because the remaining language would have been enacted without the incorporation in this Code of the invalid or unconstitutional word, phrase, clause, sentence, paragraph, or section."). This portion of the County Code falls victim to the same outstanding questions regarding the legislative intent to be inferred from comprehensive zoning actions.

We shall leave completion to fruition of this rhetorical exercise for another day.

target property), but with additional "plus factors" (almost *prima facie* aggrieved).  *See*

*Ray*, 430 Md. at 81–91, 59 A.3d at 549–54.  This could mean, practically speaking, that

the owners of 59,045 parcels or lots in Councilmanic Districts I and IV, along with other

property owners located adjoining, confronting, or nearby the external boundaries of

those Districts, as well as other property owners located between 200 to 1000 feet from

the borders of the Districts (so long as they allege additional "plus factors") may *all* have

standing to challenge Bill 12-11.  Hypothetically, thousands of plaintiffs with the benefit

of property owner standing could have standing to challenge comprehensive zoning

legislation.[19]  This would be unworkable entirely.[20]  This Court has been reticent in the

---

[19] The Dissent accuses us of hyperbolizing, and counters that "[o]nly those property owners living *in very close proximity* to the 260 parcels that underwent zoning changes under Bill 12-11 could have standing to challenge the comprehensive rezoning."  Dissent Slip Op. at 3–4 (emphasis added).  The Dissent appears to introduce a fourth category of protestants with standing who, despite being removed from the subject property, may be able nevertheless to establish the fact that he, she, or its personal or property rights are specially and adversely affected by rezoning legislation.  *See supra* note 9 and accompanying text; *Ray*, 430 Md. at 85–86, 59 A.3d at 552.

[20] The Dissent refers to this concerning result as the "floodgates" argument.  Dissent Slip Op. at 3.  First, the Dissent asserts baldly that "the *Bryniarski* special aggrievement standard, as further explicated in *Ray*, will effectively limit the class of plaintiffs entitled to judicial relief."  Dissent Slip Op. at 4 (footnotes omitted).  As discussed above, however, there is no reason to think that the application of property owner standing to comprehensive zoning legislation will limit the class of potential plaintiffs—indeed, it will expand the class exponentially.

Next, the Dissent suggests:

> There is no reason to think that most comprehensive rezonings, which are adopted by *elected* officials, will be so offensive to property owners that, as the Majority projects, thousands (or even hundreds) of them will pursue judicial relief.  Surely, the costs of conducting such a lawsuit, together

(Continued…)

extreme to construe standing doctrines so broadly, out of the reasonable fear that to do so would eviscerate altogether the distinct doctrines.

In *Ray*, two individual residents located approximately 0.4 miles away from an approved PUD argued that they were specially aggrieved in a manner different from the general public in their attempt to challenge judicially the PUD's approval. *Ray*, 430 Md. at 78–80, 59 A.3d at 547–48. On direct appeal, the Court of Special Appeals concluded that the two residents' aggrievement was the same as that of the general public, so they did not have property owner standing. *Ray*, 430 Md. at 79–80, 59 A.3d at 548. Before us, the petitioners argued that the intermediate appellate court compared improperly them to other residents of the neighborhoods which they asserted the PUD would impact. *Ray*, 430 Md. at 86, 59 A.3d at 552. In essence, the two residents asked the Court to "define [their] two [respective] neighborhoods as the aggrieved class." *Ray*, 430 Md. at 87, 59

---

(…continued)
> with the dismal prospects for success on the merits, will be unpalatable to most.
>
> Even with standing secured, property owners face a precipitous up-hill battle to win a declaration that a comprehensive rezoning ordinance is invalid.

Dissent Slip Op. at 5 (emphasis in original) (citations omitted). We take little comfort in the proffered notion that expanding radically the applicability of the doctrine of property owner standing will have little practical impact because few property owners will take advantage of the new standing rules.

Finally, the Dissent suggests that the cost of the potential increase in declaratory judgment actions "is justified by the need to provide a judicial means to challenge an illegal legislative action injurious to a property interest." Dissent Slip Op. at 7. As we discuss above, however, taxpayer standing is available to complainants wishing to challenge comprehensive zoning legislation. Ironically, the Dissent cites, in support of this argument, a portion of *Mayor and City Council of Baltimore v. Gill*, 31 Md. 375, 395 (1869), which discusses the purposes and function of *taxpayer* standing. *Id.*

31

A.3d at 552. We noted that "the creation of a class of aggrieved persons is done on an individual scale and not based on delineations of city neighborhoods." *Ray*, 430 Md. at 88, 59 A.3d at 553. We continued:

> Creating a bright-line rule, under which each person in the entire neighborhood qualifies as a member of the specially aggrieved class in every PUD case, as [p]etitioners propose, would be tantamount to abandoning the *Bryniarski* rule that the facts and circumstances of each case would govern. We decline to adopt such a bright-line rule. Instead, we will examine the specific facts alleged to show aggrievement in this case and compare that injury to harm suffered by the general public.

*Ray*, 430 Md. at 90, 59 A.3d at 554 (footnote omitted). This analysis reflects an unwillingness to extend standing to large swaths of neighborhoods or districts simultaneously simply by virtue of relative location, without regard for specific facts and circumstances showing special aggrievement.

Similar policy concerns underscore the analysis of standing in *State Center*. In considering whether appellees there alleged sufficient facts for "special aggrievement" to confer property owner standing, we considered first whether they constituted *prima facie* aggrieved property owners. *State Center*, 438 Md. at 528–33, 92 A.3d at 446–48. Owning properties between 0.57 and 0.84 miles distant from the State Center Project, and therefore too far away to be *prima facie* aggrieved, *State Center*, 438 Md. at 530–31, 92 A.3d at 447, appellees struggled to demonstrate how they were specially aggrieved in a manner different from the general public. *State Center*, 438 Md. at 531, 92 A.3d at 447. They turned to an argument that the entire Transit-Oriented Development ("TOD") area, within which the State Center project was contained, was the affected area. *Id.* We

32

rejected that argument, reasoning, "[u]sing the TOD area to define the affected area would provide virtually every property owner in the City with standing. This Court has held multiple times that similarly sweeping definitions of 'proximity' destroy the very concept of 'special aggrievement.'" *Id.* (referencing *Ray*, 430 Md. at 87–90, 59 A.3d at 552–54).

Appellees in *State Center* attempted to distinguish themselves from the petitioners in *Ray* by explaining that the TOD area simply expanded the area of the State Center Project, not the class of aggrieved persons. *State Center*, 438 Md. at 532, 92 A.3d at 448. We concluded that that argument, although framed differently than in *Ray*,

> similarly fails . . . to explain how such a definition would support the notion of a "*special* aggrievement." At the core of this argument (and that rejected in *Ray*) is the failure to recognize that such a wide sweep is not consistent with the "roots" of this concept of special aggrievement . . . .

*Id.* (emphasis in original). The "roots" of the property owner standing doctrine to which we referred are the laws pertaining to the tort action of public nuisance. *State Center*, 438 Md. at 520–21, 92 A.3d at 441. In *Ray*, we explained:

> [T]he "special damage" rule was an outgrowth of the law of public nuisance. **Inasmuch as public nuisance was an offense against the state and, accordingly, was subject to abatement on motion of the proper governmental agency, an individual could not maintain an action for public nuisance unless he suffered some special damage from the public nuisance.**

*Ray*, 430 Md. at 82, 59 A.3d at 549 (emphasis added in *Ray*) (quoting 4 Edward H. Ziegler, Jr., *Rathkopf's The Law of Zoning and Planning* § 63:14 (2012) (quoting *Skaggs-Albertson's v. ABC Liquors, Inc.*, 363 So.2d 1082, 1088 (Fla. 1978))). Ever wary of

over-expanding a class of aggrieved persons, we concluded that appellees in *State Center* failed to allege how the State Center Project would cause them any special kind of harm different from that suffered by the general community. *State Center*, 438 Md. at 533, 92 A.3d at 448. Accordingly, we declined the invitation to satisfy proximity based on the entire TOD area. *Id.*

Imposing limitations on the numerical class of potential claimants is consistent with the point of standing laws generally. As noted by the venerable scribe of all things involving Maryland zoning and land use, Stanley D. Abrams, Esquire, the standing requirement is

> based upon the necessity of limiting the parties to the proceeding to those who are uniquely affected by the decision which is being appealed and precluding frivolous appeals, harassment, or merely crowding the courts with litigation instituted by or involving those persons who are not specially affected by the decision and have no statutory right of appeal.

Stanley D. Abrams, *Guide to Maryland Zoning Decisions*, § 4.01 (5th ed. 2012). Extending the doctrine of property owner standing to challenges to the legislative process of adopting comprehensive zoning ordinances runs afoul of the narrowing principles articulated in *Ray* and *State Center* and is inconsistent with our prior cases as explained above.

The Dissent expresses concern that property owners believing themselves impacted negatively by select rezonings with a comprehensive zoning would have no judicial recourse to challenge judicially such legislative action unless their ability to

maintain a challenge were measured by property owner standing principles.[21] Dissent Slip Op. at 7 ("Even if declaratory judgment actions do modestly increase, that cost is justified by the need to provide a judicial means to challenge an illegal legislative action injurious to a property interest."). The Dissent is incorrect to conclude that the doctrine of property owner standing is the only meaningful[22] platform for complainants with "a special interest in the subject-matter of the suit distinct from that of the general public" to challenge comprehensive rezoning legislative actions. *State Center*, 438 Md. at 519, 92 A.3d at 440. The doctrine of taxpayer standing—already available to some complainants challenging administrative land use decisions—is the appropriate standing doctrine that complainants challenging comprehensive zoning legislation must satisfy.

## V. TAXPAYER STANDING: THE APPROPRIATE DOCTRINE TO APPLY

Challengers to comprehensive zoning ordinances, i.e., legislation such as Bill 12-11, are required to satisfy the requirements of taxpayer standing, rather than property owner standing.

### A. Taxpayer Standing: What Is It?

We discussed the doctrine of taxpayer standing at length in *State Center*. 438 Md. at 538–83, 92 A.3d at 451–79. This common law standing doctrine "permits taxpayers to

---

[21] The Dissent notes that, in Anne Arundel County, property owners may challenge comprehensive zoning by petitioning the ordinance to referendum. Dissent Slip Op. at 7 n.7. Because the requirements for petitioning ordinances to referendum necessitate some effort (i.e., the challenger must obtain signatures from 10% of the qualified voters in the County), the Dissent determines that this procedure is too burdensome. *Id.*

[22] *See supra* note 23.

seek the aid of courts, exercising equity powers, to enjoin illegal and *ultra vires* acts of public officials where those acts are reasonably likely to result in pecuniary loss to the taxpayer." *State Center*, 438 Md. at 538, 92 A.3d at 451. The doctrine exists to ensure that governments act within the bounds of the law:

> In this state the Courts have always maintained **with jealous vigilance** the restraints and limitations imposed by law upon the exercise of power by municipal and other corporations; and **have not hesitated to exercise their rightful jurisdiction for the purpose of restraining them** within the limits of their lawful authority, and of protecting the citizen from the consequence of their unauthorized or illegal acts.

*State Center*, 438 Md. at 539–40, 92 A.3d at 452 (quoting *Baltimore v. Gill*, 31 Md. 375, 395 (1869) (emphasis added in *State Center*)). Like the doctrine of property owner standing, taxpayer standing provides the "cause of action" standing sufficient for justiciability. *See State Center*, 438 Md. at 546, 92 A.3d at 456 ("[T]axpayer suits in this State do not require also a separate private right of action . . . ."). Neither the doctrines of taxpayer standing nor property owner standing provide unfettered access to the courts to citizens unhappy with all actions taken by state or local governing bodies, however. Under the taxpayer standing doctrine, as well as the property owner standing doctrine, "the complainant must have a special interest in the subject-matter of the suit distinct from that of the general public." *State Center*, 438 Md. at 519, 92 A.3d at 440.

Due to the "disorganized" and "seemingly contradictory" state of our earlier cases discussing the doctrine of taxpayer standing, the *State Center* opinion took some pain to examine the application of the doctrine, clarify it, and set it straight. *State Center*, 438 Md. at 540–41, 92 A.3d at 453. A party satisfies the "special interest," also called

"special damage," standing requirement by alleging "both '1) an action by a municipal corporation or public official that is illegal or *ultra vires*, and 2) that the action may injuriously affect the taxpayer's property, meaning that it reasonably may result in a pecuniary loss to the taxpayer or an increase in taxes.'" *State Center*, 438 Md. at 540, 92 A.3d at 453 (quoting *Kendall v. Howard County*, 431 Md. 590, 605, 66 A.3d 684, 693 (2013) (quoting *Superblock I*, 407 Md. at 267, 964 A.2d at 669–70)). After establishing those two general principles, the *State Center* opinion discussed preliminarily the "requisites for eligibility" to assert standing under the doctrine, *State Center*, 438 Md. at 547–55, 92 A.3d at 457–62, and then discussed in depth the requirements to constitute a "special interest" distinct from that of the general public. *State Center*, 438 Md. at 556–83, 92 A.3d at 463–79.

To establish eligibility to maintain a suit under the taxpayer standing doctrine, a "complainant must allege two things: (1) that the complainant is a taxpayer and (2) that the suit is brought, either expressly or implicitly, on behalf of all other taxpayers." *State Center*, 438 Md. at 547, 92 A.3d at 457; *see id.* ("[U]nder the taxpayer standing doctrine, a complainant's standing rests upon the theoretical concept that the action is brought not as an individual action, but rather as a class action by a taxpayer on behalf of other similarly situated taxpayers."). The second required allegation to establish eligibility to bring a suit under the taxpayer doctrine touches on a tension between the requirement that the suit be brought on behalf of other taxpayers and the requirement that the complainant have a special interest in the subject matter. We explored this tension in *State Center*, 438 Md. at 552–55, 92 A.3d at 460–62, concluding that even if the complainant does not

allege expressly that he, she, or it brings their suit on behalf of other taxpayers situated similarly,

> [T]he doctrine may apply yet, if the action is, in fact, on behalf of the taxpayers as a class, by necessary implication from the nature of the alleged injury pleaded in the [complaint]. In other words, the allegations of the injury must apply to all taxpayers in the assumed class and not merely the plaintiffs as private complainants, in order for the taxpayer standing doctrine to apply.

*State Center*, 438 Md. at 554–55, 92 A.3d at 462.

Once a complainant establishes eligibility to bring a suit, he, she, or it must allege, as noted above, both a governmental action that is illegal or *ultra vires* and that the action may affect injuriously the taxpayer's property (meaning that it reasonably may result in a pecuniary loss to the taxpayer or an increase in taxes). *See State Center*, 438 Md. at 540, 92 A.3d at 453. The "illegal or *ultra vires*" requirement "has been applied leniently and seems rather easy to meet"—the taxpayer need not be right ultimately in his, her, or its contention, so long as the allegation is advanced in good faith. *State Center*, 438 Md. at 555–56, 92 A.3d at 462–63 (citing *Funk v. Mullan Contracting Co.*, 197 Md. 192, 196, 78 A.2d 632, 635 (1951)). The "specific injury" requirement is forgiving similarly and "'has been interpreted repeatedly to require a showing that the action being challenged results in a pecuniary loss or an increase in taxes.'" *State Center*, 438 Md. at 556–57, 92 A.3d at 463 (quoting *Citizens Planning and Housing Ass'n v. County Executive of Baltimore County*, 273 Md. 333, 339, 329 A.2d 681, 684 (1974) (citations omitted)); *see State Center*, 438 Md. at 557, 92 A.3d at 463 ("[T]he special interest that is distinct from the general public is the *increased burden of taxation*." (emphasis in original)); *see also*

38

*Ruark v. International Union of Operating Engineers, Local Union No. 37*, 157 Md. 576, 589–90, 146 A. 797, 802–03 (1929). The facts alleged need not lead necessarily to the conclusion that taxes will increase; rather, the taxpayer must allege that he, she, or it will suffer pecuniary damage potentially. *State Center*, 438 Md. at 559, 92 A.3d at 464 (quoting *Inlet Associates. v. Assateague House Condo. Ass'n*, 313 Md. 413, 441, 545 A.2d 1296, 1310 (1988)). *State Center* analyzed at length what types of "harm" amount to a pecuniary loss in light of our precedent. *State Center*, 438 Md. at 560–72, 92 A.3d at 465–72. We concluded that "the issue is not what 'type' of harm is sufficient necessarily, but rather a much more forgiving question of whether the type of harm is one that may affect the complainant's taxes." *State Center*, 438 Md. at 565, 92 A.3d at 468.

Naturally, there must be a "nexus" between the showing of potential pecuniary damage and the challenged act. *State Center*, 438 Md. at 572–80, 92 A.3d at 472–77. This is "[p]erhaps the most frequent stumbling block" for complainants claiming taxpayer standing. *State Center*, 438 Md. at 572, 92 A.3d at 472. We concluded in *State Center* that

> [a] review of the cases reveals that the taxpayer must be asserting a challenge and seeking a remedy that, if granted, would alleviate the tax burden on that individual and others; otherwise, standing does not exist. The corollary to this requirement is also that taxpayers may challenge only certain statutes. In viewing other areas of law, we have not permitted taxpayers to enforce any statute unless it affects the taxpayers' individual tax burden.

*State Center*, 438 Md. at 572–73, 92 A.3d at 472 (footnote omitted). There must be therefore a connection between the alleged illegal or *ultra vires* act, the harm caused to

39

the taxpayer, and the potential for the remedy to alleviate the harm incurred. *See State Center*, 438 Md. at 573–75, 92 A.3d at 473–74. Furthermore, this nexus must be true not only for the complainant, but also all similarly situated taxpayers. *See State Center*, 438 Md. at 575, 92 A.3d at 474 ("[T]he remedy sought, if granted, must alleviate *all* similarly situated taxpayers' burden, not just the plaintiffs' personal burdens." (emphasis in original)).

### B. Taxpayer Standing: When It Applies

In light of its requirement that "an action by a municipal corporation or public official" be illegal or *ultra vires*, *State Center*, 438 Md. at 540, 92 A.3d at 453, taxpayer standing has been pled successfully in a number of cases pertaining to executive, administrative, or quasi-land use actions. *See, e.g.*, *State Center*, 438 Md. at 583, 92 A.3d at 479 (acknowledging taxpayer standing in a challenge of an executive action); *Superblock I*, 407 Md. at 269–70, 964 A.2d at 671 (finding taxpayer and, alternatively, property owner standing in a challenge of executive actions taken by Mayor and City Council of Baltimore); *Inlet Associates*, 313 Md. at 440–43, 545 A.2d at 1310–11 (alleging successfully taxpayer standing when seeking to enjoin an executive action conveying a public right-of-way and riparian rights purported to accrue as a result thereof); *James v. Anderson*, 281 Md. 137, 140, 377 A.2d 865, 868 (1977) (challenging a county executive's expenditures of bond proceeds on the construction of a new courthouse); *Citizens Planning*, 273 Md. at 345, 329 A.2d at 687 (challenging an internal reorganization of the Baltimore County Office of Planning and Zoning as violating the Baltimore County Charter). Taxpayer standing has also been pled successfully in cases

challenging legislation generally. *See, e.g.*, *Ansell v. Howard County Council*, 264 Md. 629, 634, 287 A.2d 774, 776 (1972) (alleging successfully taxpayer standing when challenging a resolution authorizing the president of the Howard County Board of Education to enter into contracts relating to the construction and modernization of schools); *Mayor and City Council of Baltimore v. Keyser*, 72 Md. 106, 19 A. 706 (1890) (challenging legislation that created a suburban sanitary district).

Challenges to comprehensive zoning ordinances are brought often by parties whose properties were rezoned, usually to categories less desirable by the owner or contract purchaser than enjoyed previously. *See, e.g.*, *Anderson House*, 402 Md. at 706, 939 A.2d at 126 ("Anderson House is entitled to have the Circuit Court consider its claims as to Ordinance 7-03 because the C-T zone created by that legislation was applied to the Anderson House property through Ordinance 21-05. Thus, its rights were affected and the Circuit Court had jurisdiction to review the challenge to its enactment."); *Anne Arundel County v. Moushabek*, 269 Md. 419, 306 A.2d 517 (1973); *Ford v. Baltimore County*, 268 Md. 172, 300 A.2d 204 (1973); *Nottingham Village, Inc. v. Baltimore County*, 266 Md. 339, 292 A.2d 680 (1972); *County Commissioners of Queen Anne's County v. Miles*, 246 Md. 355, 228 A.2d 450 (1967); *Montgomery County v. Horman*, 46 Md. App. 491, 418 A.2d 1249 (1980).

Requiring taxpayer standing for challenges to comprehensive legislative enactments regulating land use is consistent with our case law. In *Boitnott v. Mayor and City Council of Baltimore*, 356 Md. 226, 738 A.2d 881 (1999), we considered the validity of a Baltimore City ordinance amending an urban renewal plan concerning the

41

development of a hotel in the Inner Harbor East section of Baltimore City. In that case, several taxpayers filed a "Complaint for Declaratory Relief, Motion for Interlocutory Injunction" against the Mayor and City Council of Baltimore seeking to invalidate the ordinance. *Boitnott*, 356 Md. at 232, 738 A.2d at 884. The Circuit Court determined that the ordinance was valid. *Boitnott*, 356 Md. at 233, 738 A.2d at 885. The taxpayers appealed to the Court of Special Appeals, which affirmed. *Boitnott*, 356 Md. at 234, 738 A.2d at 885. The taxpayers petitioned this Court for certiorari, arguing that the ordinance was invalid for a number of reasons.[23] *Id.*

Before addressing the taxpayers' substantive arguments, the Court addressed first their standing. *Id.* Noting that "Maryland has gone rather far in sustaining the standing of taxpayers to challenge . . . alleged illegal and ultra vires actions of public officials," the Court found that the taxpayers alleged appropriately taxpayer standing in filing their complaint. *Id.* (internal quotations omitted). Because the taxpayers alleged that the City of Baltimore expended twenty million dollars in developing the urban renewal area, they alleged sufficiently potential pecuniary damage by way of an increase in taxes to sustain taxpayer standing. *Id.* Of note to the present case, the Court in *Boitnott* did not determine that the taxpayers had standing because they owned property located adjoining, confronting or nearby the area to be re-developed; indeed, the opinion does not note

---

[23] The taxpayers offered three arguments in support of their contention that the ordinance was invalid: 1) the property may not be changed from private to public ownership after the adoption of an urban renewal plan; 2) zoning ordinances may not be incorporated into urban renewal plans by reference; and 3) the title of the ordinance was defective. *Boitnott*, 356 Md. at 234–35, 738 A.2d at 885–86.

whether the taxpayers owned any property at all, much less where it was located. *Boitnott*, 356 Md. at 232, 738 A.2d at 884. *See also Miles*, 246 Md. at 362, 228 A.2d at 453 (alleging successfully taxpayer standing (without naming it as such) where taxpaying property owners sought a declaratory judgment challenging the validity of a county zoning ordinance and executive actions undertaken pursuant thereto); *cf. Habliston v. City of Salisbury*, 258 Md. 350, 355, 265 A.2d 885, 887 (1970) (granting property owner standing in a challenge to a piecemeal rezoning); *Chatham Corporation v. Beltram*, 252 Md. 578, 854, 251 A.2d 1, 4 (1969) (granting property owner standing in a challenge to a piecemeal rezoning); *Aubinoe v. Lewis*, 250 Md. at 652, 244 A.2d at 883 (granting property owner standing in a challenge to a piecemeal rezoning); *Richmark Realty Co. v. Whittlif*, 226 Md. 273, 281–82, 173 A.2d 196, 200–01 (1961) (concluding that taxpaying property owners residing 200 feet from property rezoned by a piecemeal rezoning ordinance had standing to attack the validity of the ordinance, without referencing property owner standing as such); *City of Baltimore v. NAACP*, 221 Md. 329, 335, 157 A.2d 433, 437 (1960) (concluding that taxpaying property owners adjacent to rezoned property had standing to attack the validity of a piecemeal rezoning ordinance and to seek an injunction against new use of the subject property); *Cassel v. Mayor and City Council of Baltimore*, 195 Md. 348, 353, 73 A.2d 486, 488 (1950) (concluding, with minimal analysis, that property owners residing less than 100 feet from property rezoned by a

piecemeal rezoning ordinance had standing to attack the validity of the amending ordinance).[24]

### C. Taxpayer Standing: How the Citizens' Suit Fairs Here

The Citizens here did not satisfy the requirements of the taxpayer standing doctrine in this case. At least two[25] of the Plaintiffs listed on the Complaint for Declaratory Judgment are incorporated: Canter Farms Home Owners, Inc., and Greater

---

[24] Although *all* actions of rezoning result in adoption of an ordinance or resolution of some kind expressing the final decision to rezone (by whatever process leading to that decision), not all rezoning ordinances or resolutions are of the same nature, nor should they be treated the same for all purposes. None of the preceding cases (*Habliston v. City of Salisbury*, 258 Md. 350, 265 A.2d 885 (1970); *Chatham Corporation v. Beltram*, 252 Md. 578, 251 A.2d 1 (1969); *Aubinoe v. Lewis*, 250 Md. 645, 244 A.2d 879 (1968); *Richmark Realty Co. v. Whittlif*, 226 Md. 273, 173 A.2d 196 (1961); *City of Baltimore v. NAACP*, 221 Md. 329, 157 A.2d 433 (1960); and *Cassel v. Mayor and City Council of Baltimore*, 195 Md. 348, 73 A.2d 486 (1950)) involved challenges to comprehensive zoning ordinances; rather, all of them involved piecemeal rezoning approvals. The Dissent offers nothing to the contrary, i.e., a case where property owner standing was applied to authorize a judicial challenge to a comprehensive zoning ordinance. That is because neither we nor the dissenters could find one. Thus, the trial judge here was correct.

The focus should be on the nature of the underlying process culminating in a rezoning action to determine its true character, not the fact that an ordinance results nor the modality by which the plaintiff sought judicial review. As discussed at length above, *see supra* pp. 8–12, comprehensive zoning and piecemeal rezoning actions (and the respective resulting ordinances) cannot be treated the same.

[25] Crofton First may also be an incorporated entity. Although it is named on the Complaint for Declaratory Judgment (originating in C-11-163163, *Steve Bell, et al. v. Anne Arundel County, Maryland*) "Crofton First," on the Amended Petition for Judicial Review (originating in C-11-161930, *In the Matter of Steve Bell, et al.*) it is named "Crofton First, Inc."

Crofton Council, Inc. We assume that those two Plaintiffs are taxpayers.[26] Where one party has standing, we do not inquire typically as to whether another party on the same side also has standing. *State Center*, 438 Md. at 550, 92 A.3d at 458 (quoting *Board of Supervisors of Elections v. Smallwood*, 327 Md. 220, 233 n.7, 608 A.2d 1222, 1228 n.7 (1992) (quoting *Board of License Commissioners v. Haberlin*, 320 Md. 399, 404, 578 A.2d 215, 217 (1990))).

In their Complaint for Declaratory Judgment, the Citizens alleged that the actions taken by the County in adopting "the zoning reclassification[s]" in Bill 12-11 (specifically, Amendment No. 25 and Proposals No. 4-4, 4-12, and 4-17) constituted "illegal spot zoning." The Citizens also must allege, however, that the illegal action will result in a pecuniary loss or an increase in taxes. The Citizens alleged in their Complaint for Declaratory Judgment[27] that:

> 61. . . . A trade school will create constant traffic and will destroy a forest buffer screening the over-congested Crain Highway from Plaintiffs' homes. . . .
>
> . . .
>
> 68. Noise is a primary concern for Plaintiffs who live in close proximity to the land subject to Proposal Nos. 4-4 and 4-12. . . . Proposal Nos. 4-4 and 4-12 will allow commercial land uses on land located closer to Plaintiffs than the businesses located on the Median of Route 3 and will

---

[26] In *State Center*, we assumed that various incorporated entities were taxpaying corporations based on their legal identities. *See State Center*, 438 Md. at 550–51, 92 A.3d at 459; *see id.* at 551 n.59, 92 A.3d at 459 n.59.

[27] The Amended Petition for Judicial Review is extremely short and contains no allegations of harm of any kind to the Citizens.

drastically increase the already unreasonable noise pollution in Plaintiffs' community. . . .

. . .

37.[28] Plaintiffs' right to participation in zoning changes and in the enforcement of the orderly planning procedures specified in the County Code have been harmed.[29]

Notably, the Citizens did not allege that their taxes would be increased or that the illegal action would result in any other form of pecuniary loss.[30] The trial judge concluded

---

[28] The Complaint contains two paragraphs numbered 37 and 38. The second set (including the language quoted here) appears to have been inserted between paragraphs number 86 and 87 and mis-numbered inadvertently.

[29] Paragraphs numbered 90 and 96 contain identical allegations to this one.

[30] Attached to Plaintiffs Memorandum in Support of Opposition to Intervenor Defendants Sincaltom Associates, David Callahan, BWI Technology Park Phase III, LLC, and United Properties, LLP's Motions to Dismiss and Request for a Hearing are Exhibits D, H, and I, consisting of the Affidavits of Rosie M. Shorter ("Shorter"), William S. Chapin ("Chapin"), and Stephen Bell ("Bell"), respectively. Shorter, a resident of 2566 Shorter Road, owns residential property that abuts two parcels (which were reclassified from open space and low density residential uses to a more intensive residential classification). She stated:

> 6. It is my opinion that my property value will be affected by Amendment No. 25's zoning changes and that the tax assessment for my property will increase.
> 7. It is my opinion that Amendment No. 25's zoning changes will increase traffic on Route 3, which will make it more dangerous for me to access Route 3 from Capital Raceway Road.
> 8. It is my opinion that Amendment No. 25's zoning changes will alter the character of my neighborhood and the way that I live. The wooded environment and quite nature of my neighborhood will be destroyed.

(Continued…)

46

rightly[31] that "potential changes to the neighborhood, including increased traffic . . . are general problems and not problems specific to the Plaintiffs." Frustration with increased traffic, annoyance with increased noise, and violations of a right (if any) to participate in zoning changes are not the sort of harms with which taxpayer standing is concerned. Even if these harms were within the purview of taxpayer standing, they are not unique to

---

(…continued)
Chapin owns residential property located approximately 100 feet from one parcel of land which was reclassified from a residential to a commercial zone and 500 feet from another. He stated, *inter alia*:

> 15. I am familiar with the property values in my neighborhood. My home is currently worth approximately $550,000. It is my opinion that Proposal Nos. 4-4 and 4-12 will adversely affect my property value for reasons related to traffic, noise, privacy, and a change in the neighborhood. . . . I estimate that my property value will decline by 15-20% due to Proposal Nos. 4-4 and 4-12.

Bell owns residential property situated approximately 80 feet from one parcel of land which was reclassified from a residential to a commercial zone and 500 feet from another. His statements echo those of Chapin.

As these statements were not made in support of allegations contained in the Complaint for Declaratory Judgment nor the Amended Petition for Judicial Review, they are not available to make out a *prima facie* showing of the "harm" required by taxpayer standing.

[31] The trial judge considered that these problems were not specific to the Citizens in the context of discussing (apparently) property owner standing. Although she did not mention the standing doctrine as such, she discussed, *inter alia*, *Bryniarski* and *Ray*.

the Citizens, as opposed to the general public.  Accordingly, the Citizens did not satisfy the requirements of taxpayer standing.[32]

### VI.CONCLUSION

Property owner standing does not apply to judicial challenges to comprehensive zoning legislation.  Rather, complainants must satisfy the requirements of taxpayer standing to challenge such legislation.  Because the Citizens did not allege sufficiently the elements of taxpayer standing, the trial court granted appropriately Petitioners' Motions to Dismiss.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY; COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENTS.**

---

[32] Because the Citizens have not alleged properly that they would suffer the requisite harm, we need not determine whether the Citizens alleged sufficiently that their suit was brought on behalf of all other taxpayers similarly situated.

Circuit Court for Anne Arundel County
Case No.: C-11-163163
Argued: December 5, 2014

IN THE COURT OF APPEALS

OF MARYLAND

No. 29

September Term, 2014

ANNE ARUNDEL COUNTY, MARYLAND,
et al.

v.

STEVE BELL, et al.

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

Dissenting Opinion by Adkins, J., which
Battaglia and McDonald, JJ., join.

Filed: April 21, 2015

Respectfully, I dissent.  Contrary to the Majority, I would hold that the property owner standing doctrine ("proximity standing") applied in *Bryniarski* and *Ray* is appropriate when a protestant challenges legislative comprehensive zoning.  Use of this doctrine will protect landowners who are specially aggrieved by a zoning change and will not unduly burden either local governments or the courts.  It is more consistent with our recent case law than the standard adopted by the Majority—taxpayer standing.  The latter doctrine, applicable to challenges to governmental expenditures of taxpayer dollars, is unsuitable to address governmental land use decisions.

In its attempt to disavow a trend towards broad use of proximity standing, the Majority re-interprets our decisions in *Superblock I,*[1] *Superblock III,*[2] and *State Center,*[3] imposing a new, more circumscribed reading than is justified.

In *Superblock I*, we applied proximity standing because the protestants were challenging *land use decisions*.  We reasoned that "[b]ecause *land use* . . . is at least one of the prime considerations with which an urban renewal plan is reasonably sure to be concerned, . . . the principles that confer standing upon an adjoining, confronting or neighboring property owner to seek judicial review of *land use* decisions, logically extend to an adjoining, confronting or neighboring property owner that is challenging a municipalit[y's] allegedly illegal avoidance of urban renewal and procurement

_____

[1] *120 W. Fayette St., LLLP v. Mayor of Balt.*, 407 Md. 253, 964 A.2d 662 (2009).

[2] *120 W. Fayette St., LLLP v. Mayor of Balt.,* 426 Md. 14, 43 A.3d 355 (2012).

[3] *State Center, LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 92 A.3d 400 (2014).

ordinances." *Superblock I*, 407 Md. 253, 272, 964 A.2d 662, 673 (2009) (first ellipses in original) (emphasis added) (internal citations omitted).  The Court did not ground its decision on the administrative nature of the land use decision approving the Land Disposition Agreement.  *See id.* at 273, 964 A.2d at 673 ("The facts alleged by 120 West Fayette support its standing to bring its claim by virtue of its status as a property owner adjacent to the Superblock.").  The Majority's claim that *Superblock I* stands for the proposition that proximity standing is limited to challenges to a decision by an administrative, executive, or quasi-judicial body is simply not supported by the language of the opinion.

In *Superblock III*, this Court adopted a broad definition of "land use decision": any ordinance or regulation "enacted or promulgated by a legislative or administrative body for the purpose of directing the development of real estate."  426 Md. 14, 30, 43 A.3d 355, 365 (2012) (citation omitted); *see id.* at 31, 43 A.3d at 365 (providing the following examples of "land use decisions": ordinances, variances, reclassifications, special exceptions, permits, and licenses).  Recently, in *State Center*, we again endorsed that broad definition. 438 Md. 451, 525, 92 A.3d 400, 444 (2014) (Harrell, J.) (concluding that "although not traditional land use regulations or ordinances," the formative contracts for the State Center Project were land use decisions because they "govern the development of real estate"). Because we held in *Superblock I* that proximity standing applies to challenges to land use

decisions,[4] and we confirmed in *Superblock III* and *State Center* that "land use decisions" are any decisions directing or governing the development of real estate, I deduce that proximity standing is not limited to administrative land use decisions, but also applies to legislative land use decisions like comprehensive zoning.

The Majority relies heavily on a "floodgates" rationale, arguing that because Bill 12-11 encompassed the entirety of Councilmanic Districts I and IV, applying proximity standing to challenges to Bill 12-11 would arguably permit every property owner in these Districts to gain standing. The Majority hypothesizes as follows:

> This could mean, practically speaking, that the owners of 59,045 parcels or lots in Councilmanic Districts I and IV, along with other property owners located adjoining, confronting, or nearby the external boundaries of those Districts, as well as other property owners located between 200 to 1000 feet from the borders of the Districts (so long as they allege additional "plus factors") may *all* have standing to challenge Bill 12-11. Hypothetically, thousands of plaintiffs with the benefit of property owner standing could have standing to challenge comprehensive zoning legislation.

Maj. Slip Op. at 30 (emphasis in original). This projection is simply hyperbole. Only those property owners living in very close proximity to the 260 parcels that underwent zoning

---

[4] *See Superblock I*, 407 Md. at 272, 964 A.2d at 673 ("Because *land use* . . . is at least one of the prime considerations with which an urban renewal plan is reasonably sure to be concerned, . . . the principles that confer standing upon an adjoining, confronting or neighboring property owner to seek judicial review of *land use* decisions, logically extend to an *adjoining, confronting or neighboring property owner* that is challenging a municipalit[y's] allegedly illegal avoidance of urban renewal and procurement ordinances." (first ellipses in original) (emphasis added) (internal citations omitted)).

changes under Bill 12-11 could have standing to challenge the comprehensive rezoning. This entire "floodgates" reasoning is unsound.

Indeed, existing law already provides a dam against flooding. The *Bryniarski*[5] special aggrievement standard, as further explicated in *Ray*,[6] will effectively limit the class of plaintiffs entitled to judicial relief. All property owners must demonstrate special aggrievement in order to gain standing to challenge a land use decision like a legislative comprehensive rezoning. *Ray v. Mayor of Balt.*, 430 Md. 74, 77, 59 A.3d 545, 547 (2013) ("As we have explained, to have standing to challenge a zoning reclassification, a person's property interest 'must be such that he is personally and specially affected in a way different from that suffered by the public generally.'" (quoting *Bryniarski v. Montgomery Cnty. Bd. of Appeals,* 247 Md. 137, 144, 230 A.2d 289, 294 (1967))). Contrary to the Majority's view, proximity standing does not eviscerate the special aggrievement requirement, but rather allows protestants to demonstrate special aggrievement based on their proximity and other "plus factors." *See id.* at 85, 59 A.3d at 551–52 (the *prima facie* and almost *prima facie* aggrievement standards are based on special aggrievement).

In *Ray*, we concluded that "proximity is the most important factor to be considered" when determining whether a protestant has been specially aggrieved. *Id.* at 82–83, 59 A.3d at 550. The importance of proximity to special aggrievement does not recede simply because a local government enacts a comprehensive rezoning ordinance. In this case, one

---

[5] *Bryniarski v. Montgomery Cnty. Bd. of Appeals,* 247 Md. 137, 230 A.2d 289 (1967).

[6] *Ray v. Mayor of Balt.*, 430 Md. 74, 59 A.3d 545 (2013).

of the Citizens, Rosie Shorter, owns property that adjoins or confronts property that Bill 12-11 rezoned from open space, rural agricultural, or low-density residential classifications to mixed-use residential. Banks, grocery stores, nursing homes, restaurants, taverns, office buildings, and health clubs are all permitted in zones classified mixed-use residential. *See* Anne Arundel Cnty. Code § 18-8-301(b). The mechanism for a change in zoning classification of a property should not eliminate the presumption that Ms. Shorter is *prima facie* aggrieved based on her proximity to land now subject to a far more intensive use. *See Ray*, 430 Md. at 81, 59 A.3d at 549 ("'An adjoining, confronting or nearby property owner is deemed, *prima facie,* to be specially damaged and, therefore, a person aggrieved.'" (quoting *Bryniarski*, 247 Md. at 145, 230 A.2d at 294)).

There is no reason to think that most comprehensive rezonings, which are adopted by *elected* officials, will be so offensive to property owners that, as the Majority projects, thousands (or even hundreds) of them will pursue judicial relief. *See* Maj. Slip Op. at 30. Surely, the costs of conducting such a lawsuit, together with the dismal prospects for success on the merits, will be unpalatable to most.

Even with standing secured, property owners face a precipitous up-hill battle to win a declaration that a comprehensive rezoning ordinance is invalid. We have long recognized that comprehensive rezoning ordinances are entitled to a strong presumption of correctness. *See, e.g.*, *Howard Cnty., Md. v. Dorsey*, 292 Md. 351, 355, 438 A.2d 1339, 1342 (1982) ("This Court has repeatedly recognized that there is a strong presumption of the correctness of . . . comprehensive rezoning, and that 'strong evidence' of error is required to overcome

5

that presumption." (citation omitted)).  According Respondents standing would not change the substantive law.

As we said in *Anderson House, LLC v. Mayor & City Council of Rockville*:

> Zoning decisions which are made during a comprehensive rezoning process are strongly presumed to be correct.
>
> * * *
>
> Comprehensive rezoning is a vital legislative function, and in making zoning decisions during the comprehensive rezoning process, a [zoning authority] is exercising what has been described as its 'plenary' legislative power.

402 Md. 689, 723, 939 A.2d 116, 136 (2008) (alteration in original) (citation and internal quotation marks omitted).  We elaborated on the strength of the presumption of correctness:

> Indisputably, [the challenger] carries the heavy burden of establishing, by clear and affirmative evidence, that [the Ordinance] is invalid.  Even where reasonable doubt exists, the Ordinance must be sustained.  "In other words, the legislature is presumed to have acted within [its police powers] so that if any state of facts reasonably can be conceived that would sustain [the Ordinance], the existence of that state of facts as a basis for the passage of the [regulation] must be assumed."

*Id.* at 724, 939 A.2d at 137 (citations and footnotes omitted); *see also Dorsey*, 292 Md. at 355, 438 A.2d at 1342 ("'While, in recent years, we have had occasion to enunciate a number of important principles applicable to the law of zoning, perhaps none is more rudimentary than the strong presumption of the correctness of original zoning and of comprehensive rezoning.'" (citation omitted)).  Applying proximity standing to comprehensive rezoning would not jettison this strong presumption of correctness.

6

Even if declaratory judgment actions do modestly increase, that cost is justified by the need to provide a judicial means to challenge an illegal legislative action injurious to a property interest.[7] *See City of Balt. v. Gill*, 31 Md. 375, 395 (1869) ("In this State the courts have always maintained with jealous vigilance the restraints and limitations imposed by law upon the exercise of power by municipal and other corporations; and have not hesitated to exercise their rightful jurisdiction for the purpose of restraining them within the limits of their lawful authority, and of protecting the citizen from the consequence of their unauthorized or illegal acts.").

The Majority holds that "[t]he doctrine of taxpayer standing—already available to some complainants challenging administrative land use decisions—is the appropriate standing doctrine that complainants challenging comprehensive zoning legislation must satisfy." Maj. Slip Op. at 35. This doctrine, however, provides a more theoretical than real remedy because as I explain below, its availability is severely limited.

With taxpayer standing "there must be a 'nexus' between the showing of potential pecuniary damage and the challenged act." Maj. Slip Op. at 39 (citing *State Center*, 438 Md. at 572–80, 92 A.3d at 472–77). In *State Center*, we recently explained the nexus requirement, indicating that "the challenged act must affect potentially a tax that the taxpayer-plaintiff pays." 438 Md. at 572, 92 A.3d at 472. We also concluded that a

---

[7] Of course, a property owner may challenge a comprehensive rezoning without resorting to the courts by petitioning the ordinance to referendum. *See* Anne Arundel Cnty. Charter, § 308. For an individual property owner to challenge a comprehensive zoning ordinance through the referendum power, however, he would have to obtain signatures from "ten per centum of the qualified voters of the County[.]" *Id.* This presents a formidable and costly challenge.

thorough review of our precedent "reveals that the taxpayer must be asserting a challenge and seeking a remedy that, if granted, would *alleviate the tax burden* on that individual and others; otherwise, standing does *not* exist." *Id.* (emphasis added) (footnote omitted). We then went on to demonstrate that "[m]any cases emphasize that standing *cannot* exist if the remedy sought would *not decrease the taxpayer's monetary burden*." *Id.* at 573, 92 A.3d at 472 (emphasis added); *see, e.g.*, *Citizens Comm. of Anne Arundel Cnty. Inc. v. Cnty. Comm'rs of Anne Arundel Cnty.*, 233 Md. 398, 197 A.2d 108 (1964) (plaintiffs challenging laws authorizing licensed gambling failed to satisfy taxpayer standing because the remedy they sought, if granted, would not decrease their monetary burden as taxpayers); *Kerpelman v. Bd. of Pub. Works of Md.*, 261 Md. 436, 276 A.2d 56 (1971) (plaintiff challenging conveyances of state land failed to allege taxpayer standing because she did not allege that the remedy she sought would decrease her monetary burden). These cases reveal the paucity of the taxpayer standing remedy offered by the Majority. The inadequacy of that remedy is a compelling reason to extend to comprehensive rezonings our longstanding jurisprudence that property owners with sufficient proximity can challenge zoning changes.

In this case, several Respondents produced affidavits stating that their property values will decrease as a result of Bill 12-11. They cannot achieve taxpayer standing because, with reduced property values, their taxes will not increase. They would have proximity standing because they live no more than 1000 feet from the rezoned parcel, and we have concluded that a depreciated property value is a "plus factor" supporting special aggrievement. *See Habliston v. City of Salisbury*, 258 Md. 350, 352, 354–55, 265 A.2d

8

885, 885–87 (1970) (protestant was specially aggrieved based on proximity and lay testimony of decreasing property value); *Chatham Corp. v. Beltram*, 252 Md. 578, 579–80, 584, 251 A.2d 1, 2, 4 (1969) (same).

We have long held that protestants who are specially aggrieved have standing to challenge land use decisions. *See, e.g.*, *Cassel v. Mayor of Balt.*, 195 Md. 348, 353, 73 A.2d 486, 487–88 (1950) ("It is an established rule that a court of equity has the power to restrain the enforcement of a void statute or ordinance at the suit of a person injuriously affected."); *Bryniarski*, 247 Md. at 144, 230 A.2d at 294 (protestant has standing to challenge a zoning action if "he is personally and specially affected in a way different from that suffered by the public generally"); *Ray*, 430 Md. at 77–78, 59 A.3d at 547 (a protestant has standing to challenge a land use decision if he satisfies the special aggrievement test articulated in *Bryniarski*). The *prima facie* and almost *prima facie* aggrievement standards—the two principal components of proximity standing—both predicate standing on special aggrievement. *See Bryniarski*, 247 Md. at 143–44, 230 A.2d at 294; *Ray*, 430 Md. at 85, 59 A.3d at 551–52. Thus, applying proximity standing to challenges to legislative comprehensive rezoning ensures that all protestants who are specially aggrieved by such rezoning have standing to challenge it in the courts.

Finally, we have accorded standing to owners whose property classifications were changed as a part of a legislative comprehensive rezoning. *See* Maj. Slip Op. at 41; *see, e.g., Anderson House*, 402 Md. at 706, 939 A.2d at 126 ("Anderson House is entitled to have the Circuit Court consider its claims as to Ordinance 7-03 because the C-T zone created by that legislation was applied to the Anderson House property through Ordinance

9

21-05. Thus, its rights were affected and the Circuit Court had jurisdiction to review the challenge to its enactment."); *Cnty. Comm'rs of Queen Anne's Cnty. v. Miles*, 246 Md. 355, 364, 228 A.2d 450, 454 (1967) (protestants had standing to challenge a comprehensive rezoning ordinance because they alleged that "the resale value of [their property], for development purposes, [was] decreased by its zoning [re]classification"). The Majority recognizes that these owners can challenge a comprehensive rezoning, but ignores the patent inequity of denying standing to their closest neighbors.

In conclusion, I would hold that proximity standing is the appropriate basis upon which a judicial challenge to a comprehensive zoning legislative action may be maintained. This conclusion is the one most consistent with our precedent, and it ensures that all property owners who are specially aggrieved by an act of legislative comprehensive rezoning have a means to challenge it in the courts.

Judge Battaglia and Judge McDonald authorize me to state that they join in the views expressed in this opinion.